UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff | : | |
| v. | : | C.A. No. 04-434-S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS**

Defendants Southern Union Co. and New England Gas Co. submit this Local Rule 56(a) statement of undisputed facts in support of their Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56.

I. The Parties

1. Plaintiff Lynore I. Horn ("Plaintiff") is a female who was a citizen of Rhode Island at all times relevant to this litigation.

2. Defendant Southern Union Co. is a Delaware corporation with its principle place of business in Pennsylvania.

3. Defendant New England Gas Co. is a d/b/a of Southern Union Co.

4. Defendants Southern Union Co. and New England Gas Co. ("Defendants" or "Gas Company") are the corporate successors to Providence Gas Co. ("Providence Gas"). Defendants acquired Providence Gas effective March 1, 2001.

5. Throughout all times relevant to this litigation, Providence Gas or Defendants conducted the business of selling natural gas for home heating and other purposes within the State of Rhode Island.

6. Throughout all times relevant to this litigation, Providence Gas or Defendants operated several facilities within the city of Providence, Rhode Island in connection with their business.

7. Facilities at Dexter St. and Weybosset St. in Providence were among those operated in by Providence Gas and Defendants during the relevant time period.

8. Plaintiff filed her judicial complaint alleging violations of the Rhode Island Civil Rights Act, and asserting a claim for intentional infliction of emotional distress, on June 4, 2004. She filed a charge with the Rhode Island Commission for Human Rights, alleging violations of the Rhode Island Fair Employment Practices Act, on May 13, 2004.

9. At all times during her employment at Providence Gas and with Defendants, Plaintiff was a member of a union which had serial collective bargaining agreements with Plaintiff's employers. Article III of each of those collective bargaining agreements contains a non-discrimination clause. See Collective Bargaining Agreements (attached as Exhibits O-S).

## II. Plaintiff's Employment History Through May 1999

10. Plaintiff became employed with Providence Gas in 1989 and worked continuously for Providence Gas, and later Defendants, until December 2004, at which time Plaintiff went on an extended leave. She was eventually terminated in December 2005.[1]

11. Plaintiff was hired for the position of cleaning person in April 1989. See Deposition of Lynore Horn, Vol. I (attached as Exhibit A) at 32:15-25. As cleaning person, Plaintiff worked the night shift, and her supervisor was Ed Bolduc. Ex. A at 33:13-14, 33:21-23.

[1] On February 22, 2006, Horn filed a charge of discrimination against defendants with the Rhode Island Commission for Human Rights alleging that she was terminated from her employment in December 2005 based on her alleged disability, post-traumatic stress disorder ("PTSD"). See Plaintiff's Charge of Discrimination, February 22, 2006 (attached as Exhibit N). Therefore, that claim of disability discrimination with respect to her termination constitutes a separate claim against defendants, and is not part of this proceeding.

12. In approximately October 1989, Plaintiff's job changed from cleaning person to meter reader. Ex. A at 34:12-20; See Occupational Classification Record of Lynore Horn (attached as Exhibit E). As meter reader, Plaintiff worked during a day shift, and her supervisor was Bob Crowley. Ex. A at 36:11-13.

13. In approximately June 1990, Plaintiff's job changed to night watchperson. Ex. A at 36:2-7; OCR. As night watchperson, Plaintiff worked from 11 p.m. to 7 a.m. at the Weybosset St. facility, and her supervisor was Ed Bolduc. Ex. A at 36:14 – 37:3.

14. In approximately January 1992, Plaintiff's job title was changed to facilities maintenance person. Ex. A at 38:12-19. At approximately the same time, Plaintiff's shift was changed to 4 p.m. to midnight, and her duties consisted of "mostly cleaning." Ex. A at 44:18-25. Plaintiff continued to work at the Weybosset St. facility at this time, and Ed Bolduc remained her supervisor. Ex. A at 45:5-8, 46:21-23.

15. On approximately March 1, 1992 , Plaintiff was moved from the Weybosset St. facility to the Dexter St. facility. Ex. A at 45:1-4, 49:4-7; Ex. E. She continued to work a 4 p.m. to midnight shift within the facilities maintenance department. Ex. A at 47:3-5, 48:12-13. Plaintiff's duties remained "more or less cleaning," but also included other maintenance jobs. Ex. A at 51:19 – 52:9. Ed Bolduc remained her supervisor.

16. In approximately 1998, Plaintiff's shift was changed to the day shift at Dexter St. She continued to work in facilities maintenance, and her duties and supervisor remained the same. Ex. A at 53:11-17.

III. Plaintiff's Allegations of Discrimination Through May 1999

17. Plaintiff alleges that her coworkers engaged in sexually-charged harassment toward her and physically threatened her, and that Ed Bolduc otherwise frequently criticized her and treated her unfairly during the period described in paragraphs 10 to 16.

18. Plaintiff did not file any grievances regarding the alleged discriminatory behavior on the part of Defendants' employees during the period described in paragraphs 10 to 16.

IV. Plaintiff's Customer Service Position, May-Oct. 1999

19. In approximately May 1999, Plaintiff was transferred to the customer service department after applying for a posted job opening there. Ex. A at 55:12-13; Ex. E. Plaintiff spent five and one-half months training for the customer service position. Ex. A at 55:19-24. Her duties during the training period consisted of attending courses and traveling with other employees to learn how to fix gas appliances. Ex. A at 55:24 – 56:3. Her supervisor in customer service was Dave Lauble. Ex. A at 56:4-11. When asked why she chose to move into customer service, Plaintiff testified, "It was a job opening. . . . New boss. New field." See Deposition of Lynore Horn Vols. II/III (attached as Exhibit B) at 149:9-17.

20. Plaintiff decided to leave customer service in October 1999 because she was informed by management that the impending acquisition of Providence Gas by Southern Union Co. placed her at risk of being "bumped" to a less favorable position in the construction and maintenance department because of her low seniority within customer service. Ex. A at 57:7-19; Ex. B at 149:19 – 152:3. When asked why she left customer service, Plaintiff testified: "The gas company was being sold, and they told us that customer service – there was a very good chance of deleting all of the customer service or bringing it down to a small number of people. They

wanted to be honest with us because we were low in seniority and we would be bumped first." Ex. B at 149:19-25.

21. Plaintiff never again worked under Lauble or with any of her co-workers in the customer service department.

V. Plaintiff's Return to Facilities Maintenance at Dexter St., Oct. 1999-Sept./Oct. 2000

22. In October 1999, Plaintiff voluntarily chose to return to the facilities maintenance department. Ex. A at 57:7-19, 63:25 – 64:5; Ex. E. She worked day shifts at the Dexter St. facility, and Ed Bolduc was her supervisor. Ex. A at 64:6-14, 23-25. Although Plaintiff initially testified that she worked at Dexter St. for only a "very short time" before moving to Weybosset St., Ex. A at 64:23-25, Ex. B at 152:6-12, she later estimated that she moved to Weybosset St. in September or October of 2000. Ex. B at 176:24 – 177:16.

23. Plaintiff alleges that during the period at Dexter St. described in paragraph 22, Ed Bolduc "decided not to talk to [her] at all," and that during the few instances he did talk to her, he would "lose [his temper] immediately." Ex. B at 178:18 -179:3. Plaintiff testified that Bolduc "started not communicating with me at all. I'm talking about where I could be standing next to him and I was non-existent." Ex. B at 178:18-22. When asked whether Bolduc used vulgar language toward her, Plaintiff testified, "no," but further stated that Bolduc addressed her using "aggressive language, degrading language." Ex. B at 180:2-7. When asked to describe any such incidents, Plaintiff testified that Bolduc "shouted at the top of his lungs, Did you go to high school? Have you graduated from high school?" Ex. B at 180:13-15. Plaintiff described his tone as "aggressive" and said he made her "nervous." Ex. B at 180:17-18. Plaintiff further admitted that "[i]t was later told to me that Carol Petrarca and Jerry Porter never graduated from high school, so it's a lot of paperwork on the boiler operator's school." Ex. B at 180:24 – 181:2.

Plaintiff also testified that she and some co-workers "were called to Weybosset St. as a group. . . On several occasions, [Bolduc] would say that I could do more, I could do this better." Ex. B at 181:16-24. Plaintiff further alleged that her co-workers disagreed with Bolduc's criticisms and that Bolduc would not criticize the others, only Plaintiff. Ex. B at 181:24 – 182:7. Bolduc testified that as a worker, Plaintiff was "adequate at times, and inadequate at times. . . . She didn't follow instructions well. She did not have . . . a good understanding, on mechanicals." See Deposition of Edward Bolduc, August 12, 2005 (attached as Exhibit C) at 33:16-29. Plaintiff has made no other allegations regarding Bolduc's "degrading" language during her period at Dexter St in 1999 and 2000.

24. When asked if there were other incidents during the period at Dexter St. from October 1999 to September or October 2000 where Plaintiff felt that any individual "did anything inappropriate that you found objectionable," Plaintiff testified that "with [co-worker] Kenneth Schiano, there were little things that they did as men that I felt were inappropriate. The only thing I can say in their favor is if I told them I felt uncomfortable, they would try to stop." Ex. B at 179:3-8. Plaintiff went on to testify that on occasion, Schiano would unintentionally expose his underwear while tucking his shirt into his "very baggy jeans." Ex. B at 179:8-14. Plaintiff testified that after the third such incident, she said to Schiano, "Do you realize that that is something you should [do] in front of your wife and not a worker. I'm not married to you. I really don't want to know what color your underwear is today. I mean, you're going a little too far. And he said, I didn't realize I was doing that. I've tucked my pants in this area the whole time. I apologize. And he tried to make an adjustment." Ex. B at 179:17 – 180:1. Plaintiff had no other complaints about Schiano during this time period.

25. When asked if there were any other incidents during the period described in paragraph 22, Plaintiff testified: "You have to remember, Dexter Street is a very verbal environment. It is nothing to hear, This fucking place, That fucking customer. But like I said, I would never sue for just that. It happens every day. It's acceptable. . . . I can tell you it did bother me a lot of times, but I have always felt that if I could walk away from it and if they were not saying it to me, that I would have to let it go . . . ." Ex. B at 182:8-24. Plaintiff had no other complaints during this time period.

VI. Facilities Maintenance at Weybosset St., Sept./Oct. 2000-May 2001

26. Plaintiff moved from the Dexter St. facility to the Weybosset St. facility sometime during what she estimated to be September or October 2000. Ex. A at 64:23 – 65:1. Immediately upon moving, Plaintiff worked during the day shift and took courses to obtain a boiler operator's license at night. The boiler operator courses lasted for approximately three months. Ex. A at 65:9 – 66:1. After she obtained a boiler operator's license, Plaintiff's job duties entailed operating and maintaining the heating and cooling units for the Weybosset St. facility, along with other maintenance tasks. Ex. A at 66:4-16. Plaintiff continued to work under the sole supervision of Ed Bolduc until May of 2001.

27. During the period at Weybosset St. through May 2001, Plaintiff's only co-worker was Jerry Porter, except that occasionally Bill Johnson, a Dexter St.-based carpenter, would "come down to help us out." Ex. B at 187:4-12. When asked how Jerry Porter treated her, Plaintiff testified, "Very good." Ex. B at 186:22-23. Plaintiff has alleged no complaints regarding Bill Johnson during the period described in paragraph 26.

28. When asked to "compare the environment in terms of language and behavior" on the Dexter St. day shift, described in paragraphs 22 to 25, to that of the Weybosset St. day shift

referenced in paragraph 26, Plaintiff testified that "there was no language at all . . . . [I]t's not an FU environment, it's more of a sexual environment." Ex. B at 184:18-24. When asked what she meant by that, Plaintiff testified: "[I]t's very permissible to talk about women, women's chests. It's very acceptable to talk about physical features of a woman. Oh, she's blessed. Like that. What kind of bra size does she wear? That type of thing." Ex. B at 185:3-10. When asked who had said that, Plaintiff could not remember: "I can't give you a specific name right now. I'm giving you things I heard in an elevator. But I'm trying to think of a name, but it's just not coming to me right now. I'm sorry." Ex. B 185:11-16.

29. Plaintiff also testified that during her time at Weybosset St. described in paragraph 26, she witnessed aspects of a "very physical relationship" between employees Millie Ortiz and Sudhir Kanar. Plaintiff testified, "I'm not talking about walking by a hallway, and, Hi, how are [you] doing today. I'm talking about her leaping into his arms when he got out of the elevator." Ex. B at 185:17 – 186:7. When asked if she had complained about this behavior, Plaintiff testified that "Jerry Porter was the only person I did a lot of talking to at Weybosset St." Ex. B at 186:9-12.

30. During the period described in paragraph 26, Plaintiff lodged two grievances with respect to overtime. The first grievance arose from Plaintiff's belief that she had been passed by for overtime work on March 25 when she should have been called. Ex. B at 188:20 – 189:20. Bolduc had called Plaintiff, but when she did not answer, he did not leave a message. See Grievance Reports dated 5/7/01 (attached as Exhibit I). The second grievance arose from Plaintiff's belief that she was not receiving overtime pay to which she was entitled for the time she spent taking boiler operator's courses. Ex. B at 189:24 – 190:15; Ex. I. Although Plaintiff could not remember the exact dates when she was in boiler operator's school, she testified that it

was certainly prior to May of 2001. Ex. B at 191:19-22. Both grievances were pursued and resolved through the normal grievance process. Ex. I.

VII. Facilities Maintenance at Weybosset St., May 2001-Sept. 2002

31. Gary Sunday began working with Ed Bolduc, Jerry Porter, and Plaintiff in May of 2001. Ex. B at 192:13-16. During May and June of 2001, Bolduc and Sunday effectively acted as co-supervisors while Bolduc prepared Sunday to take over the facilities maintenance department. Ed Bolduc retired on June 30, 2001, Ex. C at 17:24 – 18:3, after which Gary Sunday took over the facilities maintenance supervisor position. See Deposition of Edward Bolduc, November 14, 2005 (attached as Exhibit D) at 25:2.[2] Plaintiff remained in facilities maintenance at Weybosset St. under the supervision of Gary Sunday from June 2001 through August 2002. Ex. E.

32. When asked whether she heard vulgar or inappropriate language during the period from May 2001 to September 2002, Plaintiff testified, "If I did, it was scantly." Ex. B at 194:1-5. When asked if she heard comments about "women's physical appearance[s]," Plaintiff testified that when Southern Union Company came in, it had "a new executive vice president who was a woman, which was the first time." Plaintiff further testified: "The first thing that was said was that [the woman vice president] was a fat slob at Valley Gas that was in the Accounting Department, how stupid she was. . . . How fat she was. How sorry they felt. She only had the job because we feel sorry for her. They took this, I was so happy we had a woman, and made it all about her appearance; that she only had the job because she was pathetic, in Valley Gas." Ex. B at 194:12 – 195:9. When asked who had said that, Plaintiff testified: "It was somebody who had worked with her . . . . I can't recall." Ex. B at 195:2-3.

---

[2] This deposition was taken in the related case, Stamp v. Southern Union Co., C.A. No. 04-4592 (R.I. Super. Ct.).

33. When Plaintiff was asked for other such examples from May 2001 to September 2002, Plaintiff testified that "Millie Ortiz was fired because of the sexual thing," presumably referring to the alleged events described in paragraph 29. Ex. B at 195:11-14. However, when pressed on this issue, Plaintiff admitted, "I don't know what happened . . . . I don't know if she got fired or what, but I knew that she was gone." Ex. B at 195:25 – 196:4.

34. When asked if there were any other incidents during the period May 2001 to September 2002, Plaintiff discussed the so-called "glass incident," in which Ed Bolduc allegedly yelled at Plaintiff for humming and singing while on the job. Ex. B at 196:16 – 197:7. However, Ken Schiano, Plaintiff's former co-worker at Dexter St., describing the same incident, testified unequivocally that it occurred while the company was still Providence Gas, meaning that it occurred prior to March 1, 2001. See Deposition of Kenneth Schiano[3] (attached as Exhibit F) at 43:14 – 45:3; supra, ¶ 4.

35. The final incident that allegedly occurred while Ed Bolduc was still her supervisor were the events surrounding a May 31, 2001 written warning issued to Plaintiff by Gary Sunday, at Bolduc's behest, regarding unsatisfactory performance while painting on May 26, 2001. Ex. B at 198:16-21; See Deposition of Gary Sunday (attached as Exhibit G) at 41:6-17. Bolduc and Sunday were displeased with the job that Plaintiff and her co-workers, Christine Stamp and Tony Cesario, did while painting in the garage at the Weybosset St. facility on Saturday, May 26, 2001. Ex. B at 203:7-9; See Letter from Gary Sunday to Plaintiff dated May 31, 2001 (attached as Exhibit H). The following week, Plaintiff and Christine Stamp were required to scrape off paint that had been spilled on the ground. Ex. G at 51:6-10. Tony Cesario was on vacation, but would have been required to clean the paint had he been present. Ex. G at 53:4-6. Plaintiff

[3] This deposition was also taken in the Stamp case. See note 2, supra.

alleges, and Gary Sunday denies, that he told her to "Get on your hands and knees and scrub." Ex. B at 201:17-18; Ex. G. at 52:11-17. Plaintiff testified that in response to that alleged directive, "Christine and I were laughing in hysterics." Ex. B at 201:18-19.

36. Plaintiff's pay rate, work schedule, and job duties and responsibilities did not change as a result of the warning letter arising from the events described in paragraph 35. Ex. B at 203:15-23.

37. Plaintiff alleged no incidents during the month of June 2001.

38. When asked if Gary Sunday used inappropriate or vulgar language, Plaintiff testified, "I can't say so." Ex. B at 207:7-10.

39. When asked if Sunday ever used language that had sexual connotation or commented on the appearance of women, Plaintiff referred to Sunday's alleged statement that he "would not be seen with me out in public because if his wife ever saw me, he said that he would be divorced. I was not to be seen with him at all." Ex. B at 206:24 – 207:2, 11-14. Plaintiff also testified that Sunday made a "few comments on [her] hair," but went on to explain that Sunday "wanted it tied so tightly that not one little piece would fly. He seemed to be nervous about a woman having hair around machinery . . . . But he didn't degrade me like Cliff Rich[er] and call me, Blondie. It wasn't like that. That's all I can remember at this time." Ex. B at 207:15 – 208:4. Sunday testified that he was "[s]howing my concerns repeatedly because of the length of hair, to make sure that nothing tragic would happen. If you were leaning over a pump or working on a fan coil unit, to give you reminders of the consequences of it, or tell you to put it in a ponytail or wear a jacket. Now, there were observations that I made that would scare the heck out of me to see somebody get hurt like that." Ex. G at 73:9-17.

40. Plaintiff filed a grievance on July 17, 2002, which stated that Sunday violated the collective bargaining agreement by failing to call Plaintiff in for work to which she was entitled. Ex. B at 208:8-18. With respect to the event underlying the grievance, Sunday testified that a urinal was leaking and causing flooding. Ex. G at 95:17 – 96:16. After attempting, and failing, to reach both Plaintiff and Jerry Porter by telephone, Sunday fixed the urinal himself. Ex. G at 95:17 – 96:16. Sunday testified that the urinal was "over-running and could flood and go through the floors and do damage . . . . [I]t's my right to safeguard the area and make sure that nobody slips." Ex. G at 96:14 - 97:4. The grievance was pursued through the normal process and resolved, and Plaintiff was ultimately paid for four hours time. Ex. B at 208:20-25; See Grievance Report dated July 17, 2002 (attached as Exhibit J).

41. Plaintiff filed no other grievances with respect to anything that Gary Sunday did while he was her supervisor. Ex. B at 209:1-6. Plaintiff's primary complaint with Sunday was that he "would not talk to me. . . . [H]e would stop conversations when I came into the room." Ex. B at 204:2-8.

## VIII. Plaintiff Moves to Meter Reading, Sept. 2002

42. On or about September 1, 2002, Plaintiff moved to the meter reading department, but remained in that position for less than two weeks. Ex. A at 73:24 – 74:4; Ex. E. Frank Lisi was her supervisor as meter reader. Ex. A at 74:5-6.

## IX. Plaintiff Moves to Leak Survey, Sept. 2002-Dec. 2004

43. On or about September 15, 2002, Plaintiff moved into the leak survey department. Ex. A at 78:1-3; Ex. E. Cliff Richer was her supervisor. Ex. A at 78:4-6. In leak survey, Plaintiff and her co-workers were responsible for responding to and monitoring

suspected or reported gas leaks throughout Rhode Island. See Affidavit of Clifford Richer (attached as Exhibit K) ¶ 3.

44. Plaintiff transferred to leak survey at approximately the same time as several other employees who were new to the department. See Deposition of James Dawley (attached as Exhibit L) at 14:22 – 15:6. Among the new employees to leak survey during that time period were Barbara Alderman, Jim Dawley, and John Langford. Ex. A at 78:21 – 79:4. Other employees already in the department included Merle Dean, Donald Clement, and Elliot Kemp. Ex. A at 78:7-13.

45. Plaintiff alleges that there was a "bullying atmosphere" in the leak survey department. She testified: "The best way I can answer your question is, it was like working in a bar. . . . The boss [Cliff Richer] and Merle Dean had a special relationship and the bullying atmosphere was a back and forth – one would start it, one would add to it, and then back and forth." Ex. B at 212:20 – 213:4.

46. Plaintiff alleges that Cliff Richer referred to her as "One-Oar" and said things such as, "Do you have your oar in the water? Are we all here today? Oh, One-Oar has showed up." Ex. B at 217:14-16. Plaintiff also alleges that Richer called her "Blondie," although she could not estimate how many times he had done so. Ex. B at 217:21 – 218:8.

47. Richer used the nickname "One-Oar" in a casual, joking manner. He never referred to her as "Blondie". Ex. K ¶ 15. Richer used the nickname "One-Oar" only after Plaintiff and Merle Dean returned to the department laughing after a breakfast during which the waitress had mistaken "Lynore" for "One-Oar." She never objected and indeed referred to herself as "One-Oar". Ex. K ¶ 16. Richer did not know that Plaintiff was upset by the nickname "One-Oar" until he was alerted in June 2003 by his superior, Mike McGuire, that Plaintiff had

lodged a complaint. Richer immediately apologized to Plaintiff, told her that he wished she had informed him that this bothered her, and stopped using the nickname. Ex. K ¶ 17.

48. Richer did not refer to Barbara Alderman, the only other woman who worked with Plaintiff in leak survey, by any nickname. Ex. B at 223:4-7.

49. Plaintiff also testified that she took offense at Richer's alleged comment that Plaintiff must have been involved in drinking and drugs because she was brought up in the '60s and '70s. Ex. B at 219:13 – 220:25.

50. Plaintiff also testified vaguely about Merle Dean (1) commenting about the "tits on that one," referring to an actress in a movie he had seen with his wife the previous night; (2) talking about a story that circulated around the company regarding a man getting dragged around the shower by his penis; (3) singing alternate lyrics, such as "Oh, I want to fuck my wife today," to "oldies" that were on the radio; and (4) mentioning, while driving with Plaintiff, something about a "black woman [who had been] raped off the bridge." Ex. B at 230:3 – 231:18.

51. Plaintiff alleges that she was assigned to work in the construction and maintenance department ("C&M") when other employees new to leak survey were not. From approximately November through March of each year, leak survey employees may be temporarily assigned to C&M as laborers, as needed. Ex. L at 23:2-7. For this reason, leak survey employees without C&M work experience are required to undergo training within that department. Ex. L at 22:11. Jim Dawley and John Langford were not required to spend three weeks in C&M because they had previously worked in that department. Ex. L at 21:21-23, 22:5-8. Leak survey employees are required to have the training and ability to assist the C&M department at times. Plaintiff had no C&M experience, and Alderman had not successfully

completed previous C&M training. Therefore, both Plaintiff and Alderman received C&M training after arriving in leak survey. Ex. K ¶ 7; Ex. L at 22:9 – 23:19.

52. Plaintiff alleges that she was assigned unfavorable survey routes. She alleges that he did not assign her routes near her home, sent her on longer routes, e.g., to Westerly, and also sent her on routes through "bad" neighborhoods. Plaintiff testified: "When I came in and I wasn't well, it was obvious I had the flu, or something, [Richer] would send me to the worst section of South Providence where there's not even a decent bathroom. He knew I lived in Newport. And when he found that out, I never went to Newport." Ex. B at 228:2-8. Plaintiff also testified that when Barbara Alderman "was not feeling well, Cliff would say, Today, I'll make sure you have a route in East Providence so you can go home. When you're done with your day you can go home and lie down and just come in at the end of the day." Ex. B at 227:22 – 228:2.

53. Plaintiff complains about the vehicle she was assigned in leak survey. Plaintiff testified that she "assumed" vehicle assignments were done on the basis of seniority based on "previous knowledge in other departments." Ex. A at 91:9-13. However, leak survey vehicle assignments were distributed on an ad hoc, as needed basis, not by seniority. Ex. K ¶ 10.

54. At the time of Plaintiff's arrival in leak survey, the department had four of its own trucks and eight leak surveyors. Ex. K ¶ 8. Three of those trucks were already assigned to Dean, Clement, and Kemp at the time of Plaintiff's arrival in leak survey. Ex. A at 90:16-21. Because Leak Survey has had more leak surveyors than vehicles since Richer's arrival in 2002, leak survey would periodically borrow vehicles from other departments, on a temporary basis, so that each employee may have a vehicle. Ex. K ¶ 10. Many of the vehicles borrowed by leak survey were older and at times lacked heat and/or air conditioning. Ex. K ¶ 11.

55. James Dawley and Kenny Strobel, who arrived in leak survey at roughly the same time as Plaintiff, used the same trucks that they had used in their previous department, customer service. Ex. L at 19:18 -20:5. Plaintiff and John Langford were given access to other trucks from other departments, and Plaintiff took a truck that was available from the meter reading department. Ex. B at 227:14-16; Ex. L at 20:5-7.

56. Plaintiff complains that Dawley was given the fourth leak survey truck even though she had more seniority within the Gas Company than he did. Plaintiff testified that Cliff Richer told her that he assigned the fourth survey truck to Dawley because Dawley had customer service knowledge that Plaintiff did not. Ex. A at 93:8-18; Ex. B at 226:10 – 227:11. Dawley received that truck only when the truck that he had brought from customer service was "requisitioned" by the customer service department for its own use. Ex. L at 20:13-22. Dawley had worked in the customer service department for approximately five years, as compared to Plaintiff's five-and-a-half month experience in customer service. See Occupational Classification Record of James Dawley (attached as Exhibit M).

57. Leak survey is conducted by either walking survey, i.e., the leak surveyor gets out of the survey vehicle and monitors leaks while walking and using a hand-held monitoring device, or driving survey, i.e., the leak surveyor drives very slowly through the survey area using a leak monitoring device that is attached to the survey vehicle. Consequently, leak surveyors spend the vast majority of their time in the field. Ex. K ¶ 4. Newcomers to leak survey, like Dawley, Alderman, and Plaintiff, were generally assigned walking survey, and driving survey was generally given to the more experienced employees within the department. Ex. K ¶ 5. Plaintiff was not assigned more walking surveys than the other employees who came into the department at approximately the same time, including James Dawley and Barbara Alderman. Ex. K ¶ 6.

58. Plaintiff alleges that she was denied overtime while in leak survey. In determining who would be assigned overtime work, Cliff Richer generally followed the overtime list. That list, which was generally updated on a weekly basis, set forth the number of hours each Leak Survey employee had worked year-to-date. It also stated whether the employee was on leave or on "light duty" and therefore should not be called for overtime. Richer would call the "low overtime" person, i.e., the person who had logged the least overtime hours year-to-date and was not listed as "do not call", as required by the collective bargaining agreement. Ex. K ¶ 12. However, due to the nature of gas leaks and similar emergencies, Richer would, if necessary, call the person in the field closest to the site or, alternatively, a person with certain experience necessary to deal with the situation at hand. Ex. K ¶ 13. There is no evidence that Richer discriminated against Plaintiff, or women in general, in the assignment of overtime work. Ex. K ¶ 14.

59. Plaintiff complains that "[y]ou cannot get overtime for a lot of jobs if you do not have a driving survey vehicle" and that her assignment to a vehicle from meter reading prevented her from getting overtime work. Ex. B at 226:5-6. However, in 2004, Plaintiff worked virtually the exact amount of overtime hours as Donald Clement, who drove a survey vehicle. Ex. A at 90:16-21.

60. Plaintiff claims that in December 2004, co-worker Barbara Alderman called her name and showed her a gun. Plaintiff does not remember whether Alderman said anything. She left that day, and never returned to work at the Gas Company. Ex. B at 246-48. She was terminated one year later, in December 2005. As indicated in footnote 1, supra, Plaintiff has filed a separate claim with the Rhode Island Commission for Human Rights alleging that the termination was the result of disability discrimination. Ex. N.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, via Federal Express overnight delivery and by certified mail, return receipt requested, a true and accurate copy of the within document to Lynore Horn, 88 Alger Avenue, East Greenwich, RI 02821 this 30th day of June, 2006.