UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LYMORE HORN
Plaintiff

V C.A. 04-434-S

SOUTHERN UNION GAS CO,
NEW ENGLAND GAS CO.
Defendants

**PLAINTIFF'S MEMORANDUM IN REPLY TO DEFENDANT'S SUMMARY JUDGEMENT**

The Plaintiff (Pro Se ) Lynore Horn Submit this memorandum in reply to the Defendants' Motion for Summary Judgment: In the above –captioned case : This Plaintiff

Is entitled to A) the Continuing Violation Doctrine and b) Has the right to a fair trial Opposition to Summary Judgment Holds merit . When all the facts are looked at ; this plaintiff worked in an extreme hostile working environment.

"It should be noted that while the continuing violation doctrine is most often applied in the context of a Hostile work environment, it is equally applicable in the less frequent adverse employment actions –which constitute continuing violations such as disparate Impact Cases "See Bazemore v Friday et al 478 U.S.385 395-396 (1986)

The law states : Hostile work environment is pervasive and severe enough to alter the terms and conditions of employment . That the frequency of discriminatory conduct : the severity of the conduct and whether the conduct was physically threatening or humiliating – or mere offensive utterance . Harris v Forklift in 510 US 17 , 23 (1993 ) Davis v United States Postal Ser. 142 F 3d 1334 (10th Cir . 1998 )

***Continuing Violation Doctrine***

Defendants could only incorrectly argue that Plaintiff's claims of discrimination and harassment, and failure to obtain other benefits otherwise given to co-workers of Plaintiff, are time-barred.

Plaintiff counters that her claims are excepted from that rule, because she is alleging a continuing violation. Based on this continuing violation theory, Defendants' motion for summary judgment as all or part of Plaintiff's action should be denied.

Plaintiff has offered evidence to permit a reasonable jury to find that the harassment during the relevant period was "sufficiently severe or pervasive" to alter the conditions of her employment, which created an abusive working environment. See Oncole v. Sundowner Offshore Servs., 523 U.S. 75, 78 (1999); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Even if assuming, arguendo, that *some* of the events complained of by Plaintiff are time-barred (and not usable as evidence of actual harassment), these time-barred events may be considered as relevant background evidence See United Airlines Inc. v.

Evans, 431 U.S. 553, 558 (1977); Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 439 (1st Cir. 1997). These events go toward proving that a hostile work environment existed during the relevant period.

The United States Supreme Court suggests evaluating "...whether an environment is sufficiently hostile or abusive by looking at all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998); see also Harris, 510 U.S. at 23. And, Plaintiff has shown a prima facie case that the alleged harassment constituted an unreasonably abusive or offensive work environment, See DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980). That these actions commenced and lasted during Plaintiff's efforts to succeed at her job raises an issue of the continuing violation theory.

**Continuing Violation**

"There are two kinds of continuing violations: serial violations and systematic violations." Jensen v. Frank, 912 F.2d at 522. A systematic violation occurs when a Title VII violation results

from some continuing policy, itself illegal. Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 183 (1st Cir.1989). "[S]o long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint." Jensen v. Frank, 912 F.2d at 523. Plaintiff has raised a material issue of fact, by Defendants' own supervisors' utterances, that the alleged Title VII violation was caused by an overarching policy, aimed at her leaving Defendants' employ, directed toward herself, as well as a discriminatory pattern of prejudice against minority women and races. See Id.; Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d at 183. Plaintiff has herein asserted that a systematic violation occurred and that such a broad-based policy was the cause of the discrimination.

Plaintiff also has alleged that Defendants' have engaged in serial violation. A serial violation occurs when a series of discriminatory acts transpire, each of which constitutes a separate wrong actionable under Title VII and all of which emanate from the same discriminatory animus. Jensen v. Frank, 912 F.2d at 523. The linchpin to making a continuing violation actionable is that the complainant must demonstrate that some discriminatory act took place during the limitation period. Id.

"The mere effects or consequences of past discrimination, as opposed to independently actionable violations of Title VII, are insufficient to serve as the trigger of the limitations period." Kassaye v. Bryant College, 999 F.2d 603, 606 (1st Cir.1993).

In this instance, Plaintiff alleges harassment : A gun seen on am employee on her last working day : Threatened to be fired : threatened to be killed . <Name calling Niger lover < one ore <Blondie- Written paperwork handed to her from the computer : degrading woman , blonds : Men going to woman abuse classes After abusing their wife . comments : "That's the way a woman should be treated" . computers playing sexual : acts : The Plaintiff tried to get out of department : they refused even union jobs (never before in 14 years has the plaintiff not been given 30 days to try a job - She was told you hired a lawyer . Lowest on overtime : "told a single woman does not provide for a family When complained received overtime"but then received (truck damage ; smashed windows ; safety equipment gone.

Older decisions from the First Circuit interpreting continuing violations *have* inferred that while claims based on acts which have occurred within the limitation period remain actionable, those that occurred outside of the limitation period

are foreclosed. See Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir.1984); Cajigas v. Banco de Ponce, 741 F.2d 464, 470 (1st Cir.1984); Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d at 183. Nevertheless, that Court's most recent interpretations also signal the change in understanding sexual harassment as an offense that is akin to "the straw that breaks the camels back." In Kassaye v. Bryant College, 999 F.2d 603, the court stated, without any detailed analysis, that "[i]f a Title VII violation is of a continuing nature, the charge of discrimination filed with the appropriate agency may be timely as to all discriminatory acts encompassed by the violation *so long as the charge is filed during the life of the violation or within the statutory period ... which commences upon the violation's termination*." Id. at 606 (emphasis added).

Plaintiff contends that her repeated denial of overtime benefits,unfavorable working conditions, and Defendants' supervisors' ongoing: (e.g.), offensive remarks of a sexual nature regarding intercourse, derogatory and sexual comments about women in general, refusal to remove pornography, and finally an escalating pattern involving the display of handguns at the workplace, all of which led to Plaintiff's eventual inability to return to the Defendants' workplace in 2005, all represent discriminatory acts comprising a serial violation. She

further asserts that all of these acts resulted from Cliff Richer's and Bud Butler's animosity towards her based on her sex, size, and appearance. Defendants do not dispute that any of these events occurred, nor do they dispute the discriminatory nature of these acts for the purposes of this motion. Nor can Defendants' point to any efforts to alleviate or adequately address these acts.

This Court can, based on the facts alleged in this case, reasonably find that Plaintiff has properly established a series of discriminatory acts, each of which constitutes a separate wrong, actionable under Title VII, and all of which emanate from the same discriminatory animus. Jensen v. Frank, 912 F.2d at 523.

**Summary Of Pattern of Abuse**

**Hostility/ violence Unsafe working conditions**

Gun seen on a co-worker :weeks before She threatened The Plaintiff (2004)
Continued threats "I feel like killing some one today " (2003-2004 )
A Co-worker thrown into filing cabinet by boss Cliff Richer (2003 -2004)
Stolen safety articles from truck : Anything you were required to have : fired for if not wearing : Hard hat: Cones : etc (2003-2004)
working with a drunk : having to do two person jobs Alone :Unsafe
Violent outbursts by drunks on construction crews : Once shoved by drunk Union made them Apologize (1995-1999)
A gun held to Plaintiffs head : told" to get over it "Exec Told( Bud Butler) : Bob Ringman : Fred Straight : union Officials . 1994)
Boss refused to buy computerized dilution system that came with chemical : Plaintiff got injured ( Bud Butler : was apart of this meeting )He called the plaintiff Stupid .
Paul Cardin ( man who held gun to plaintiff head :2001- Verbal warning for being violent : the company fired him (for assault ) ; then rehired Then In 2002 he was accused and a statement that he : Intimidated Joan Chafee – was put in his file .
In 1992 – Plaintiff called boss guns seen on trucks :told to stay in building .
2000-2001-2002- Complained to Jim Burke-Safety Director : Ed Bolduc putting me in unsafe condition not talking to me just co-worker ( dealing with natural gas and electric ) : Kathy wall ( Nurse notified ) Jim burke was fired no Safety Dir announced
Threatened to be killed After hiring a Lawyer :Told Bob Ringman Before he was fired . (2004 )
Called D"Anna Soehnge : Vice president Human resources "Things are getting worse – They are slamming fists : shoving me : : I am in fear of my life " she said there is no silver bullet to your problem " (2004 )
From 1994 to 1997 Bob Ringman had constant meetings with plaintiff on abuse : hostility ; Letters :pornography : The plaintiff I had to deal with –
In 1998 : Bob Ringman had the plaintiff moved to days : same department said "to get her away from the violence "
In 1999/ Human rescource Vice President heard Ed Bolduc degrading – threatening Plaintiff A Meeting" She should not hear that again ". :
In 2001- Frank Devlin went from union Vice President and Customer service worker : to Vice President position :" carrying a gun" at Dexter ST During working hours ; He worked Till 2003 approx

**Sexual Objectively offensive**

Name –calling ; One Ore Blondie: degrading age : By boss (2003-2004)
Sexual film clips on computer : could here breathing groaning (2004)
Computer Emails degrading woman left on desk : car (:1998-2004)
Comment Are you on the rag :called gay when working with a woman
Two man job " said I'm ½ a man .
Told by employee I'm the president of the itty bitty tit club
"Deb Fogel "found sex with exec in garage : what position she was in .Where her legs were . This talk resumed in(-2004) when she was sent to Dexter St . Every gross tale of her sexual : acts
Co-workers singing to music: using sexual /violent words (2004)
Degrading men by penis size (2003-2004)
Gym Posters of women : in lingerie : half nude : Exec of Human resources Trisha Keene : complained :she left company after retaliation by union : Bud butler was involved in the Dialogue .
Construction trucks : Sexual magazines would fly at your feet when the truck stopped : (2003 -2004 )
Men Peeing at tree Plaintiff digging a ditch : pee running into ditch (2003-2004)
Told By Harry Bishop : Exec I could go places in the company:" If I gave a little something"
Men : Leaving behind : Rubbers filled with water : hanging from pipes : Blow up dolls
Woman fired because she said she was gay "1999"
Man With dildo in Pants(1997 );
March -1995 received a call co-worker propositioned for sex :attacked by Richard Kala :
Richard Kala : harassed a customer (Threatened her ): Bud Butler had knowledge of this .
Ed Bolduc My supervisor walked into the ladies changing room : Human rights com/ notified : Bud Butler Told them it was a closet and then changed his mind , that it was a locker room . .(1999) .
Asked for woman working sign " Men peeing as Plaintiff cleaned shower :Ed Bolduc ( Boss )saw no need . union complaint made
Verbal abuse by boss – (1998-2004) Company notified union notified .

**Differential treatment ? Men v Woman**

Unsafe working conditions : sent to south Providence for 8 weeks in a row ( While men with less seniority Headed to Newport )(2004)

Driving oldest van in dept but 3 people lower than me in seniority –told my shaking came from mercury in van ( old customer service vans spilled mercury)

Constantly told that driving this old van with mercury : That I would have retarded sick children (2003-2004)

Overtime : Complained in 2000-2001-2002-2003 -2004 Even when working with just one co-worker a man : The plaintiff had 1/5 of the overtime . complaints put into union . At grievance committee Bud Butler

Extra - workers were needed in construction Or (C&M) during the winter (2002 -2003 Into 2004 ). The Plaintiff was sent to that department while people of less seniority : were relaxing: To cold to work . no one but the plaintiff was sent to that dept in 2003 -2004 This was not overtime sent on regular 8 hour shift

In 2002 the company made Ray Conroy ;Union pres a supervisor –The company had knowledge of Federal charges and drunk driving : Drunk at work ( A woman accused of drinking : was fired immediately from the Computer dept )

Training – After work hours : For a Boiler Operators lic / : The men were paid Travel time and over time ; The boss refused to pay Plaintiff : for travel or hours at school ; Grievance /union . involved .

Men allowed constant smoking breaks : lottery ticket buying breaks : coffee breaks with boss : Plaintiff Told not to exit building unless on her lunch hour (Two people in dept a man and plaintiff )

During 2002 – told I will be a clerk : many jobs to choose from : Bud Butler Told Plaintiff you will be a clerk : Never did he tell a man being bumped that he had to be a clerk (huge loss in pay if put in that job )

**2004 : Retaliation**

Any job I applied for denied : even union –All union jobs get 30 trial not this one .

Complaint to Supervisor Human resources D'anna Soehnge :Told her called nigger lover : I was to be with my own kind : had to listen to the Man being dragged by his penis through the shower _ during work (she said I must have misunderstood :I told her No I taped it

Bob Ringman (2004) Complained about my bosses mistreatment t : name calling : age : degraded me in front of every co-worker ; Scared of being with my boss :The company fired Bob Ringman approx a month from that date

The nurse : Kathy Wall Received notes from Dr " Harassment must stop .(2004 )

All workman's comp claims denied : hurt in co-workers van (2004 )

**Again and again : You will see the name Bud Butler : He was a union President at Providence G as : till the late 1980 – early 1990 Then safety Director : Then working in Human Recourses sided by side with VP Of Human Resources**
**This man worked at both Weybosset street and Dexter : he was in charge or the nurse : For some time ; He was in involved in every Grievance : and your treatment and overtime : and safety was doled out by this man .**

# I. SUMMARY OF ARGUMENT

The conduct that gave rise to this lawsuit -- the imposition of a requirement on Plaintiff by her supervisors that, to avoid being fired or to "get along," she must:

$ tolerate sexually explicit conduct;

$ ignore derogatory sexual and racial comments by co-workers;

$ ignore punitive responses to her complaints of harassment;

$ accept supervisory denial of work benefits, including overtime and preferred duties;

-- whereas, the foregoing constitute pernicious and damaging forms of harassment that occurred in her workplace. Furthermore, these acts of supervisor tolerated sexual harassment lasted for years, not only despite being consistently brought to the attention of supervisors, but actually increased as Plaintiff sought to end the offensive and unwelcome conduct of male supervisors and co-workers.

The Supreme Court's major sexual harassment decision, Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), involved an employee's submission to her supervisor's repeated sexual harassment upon fear of losing her job. While the Court declined to address the standards for vicarious employer liability in such a case, it has subsequently called the conduct in Meritor "appalling" and "especially egregious." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993).

The law is clear that the Defendants' instant conduct also constitutes unlawful sexual discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.

(1994), and, as will be argued here, it also will likely fall into conduct involving a "tangible employment action" for which the Employer/Defendants may be strictly liable. But even if not strictly liable, the Defendants are not entitled to the relief of summary judgment as they fail to maintain the 'two prong' defenses enunciated in Faragher or Burlington.

Even before the Supreme Court's rulings in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), some courts have held that when a supervisor demands sexual favors from a subordinate, the employer must be held liable whether the subordinate employee *refuses* the sexual demands of a supervisor and loses her job (as eventually happened here) or if she tolerates the demands in order to retain her job. See, e.g., Karibian v. Columbia University, 14 F.3d 773 (2d Cir.), cert. denied 512 U.S. 57 (1994). This remains the rule under Ellerth and Faragher: In Ellerth and Faragher, the Court established that an employer is always liable for sexual harassment by a supervisor where the supervisor has taken a "tangible employment action" against a subordinate. In those circumstances, the Court held, the employer is automatically liable for the supervisor's conduct without recourse to a new affirmative defense articulated by the Court, which may be asserted in other sexual harassment cases, potentially such as this one. As will be pointed out below, Defendants here fail to meet the indicia of "reasonable care" enunciated in Fargher and Burlington for cases where the Plaintiff did not accede to demands for sexual favors. In following Burlington, one court has recently addressed a motion for summary judgment, and found that the Plaintiff had sufficiently alleged facts sufficient for a jury trial. Kurschinske v. Meadville Forging Co., W.D. Pa., No. 06-67, 6/21/07. That case, with many similarities to the instant case, also involved an employee who quit the job rather than continue her long period of complaints.

The court there also disagreed with Defendant supervisors who insisted that the Plaintiff stop complaining, or (as in this case) that the Plaintiff (not the offending male employees) would be fired.As will be developed below, there is a "tangible employment action" when a supervisor requires a subordinate to submit to his sexual demands in order to avoid losing her job or otherwise face being penalized.

This result is fully consistent with the rulings prior to Faragher and Ellerth, holding employers strictly liable where a Plaintiff alleges facts showing they chose to tolerate a supervisor's sexual harassment in order to avoid losing her job. See Karibian, 14 F.3d 773. Indeed, the "tangible employment action" framework of Faragher and Cir. 1982)), is to prevent employees from being forced to submit to "sexual blackmail" in order to work. Karibian, 14 F.3d at 778.

The post-Faragher/Ellerth opinions of the Equal Employment Opportunity Commission (EEOC) also conclude that a "tangible employment action" is factually presented in a 'submission to harassment' case. A reasonable interpretation of Title VII by EEOC may also be given notice by this Court. Decisions in other jurisdictions support this interpretation of the law as well. Finally, summary judgment is not appropriate when factual issues relating to Defendants' failures to correct the alleged harassment are disputed – to help guarantee that no one is required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living," Meritor, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 902).

## II. Argument

### A. Infliction of Sexual Harassment, or Tolerance of Same, By a Supervisor Upon a Subordinate Employee, Who Repeatedly Complained of the Abuse, Upon Threat of Termination or Other Detrimental Alteration of Employment Conditions, Is a Tangible Employment Action Within the Meaning of Ellerth and Faragher and Leads to Liability for the Employer.

#### 1. Defendants' Conduct Constitutes a "Tangible Employment Action" Under the Language and Rationale of Ellerth and Faragher

Through Ellerth and Faragher, the United States Supreme Court established a new rule on employer liability for a supervisor's sexual harassment of his subordinate. Whenever the supervisor's harassment involves a "tangible employment action" against the subordinate, the employer's liability is established. Assuming *arguendo*, there is no tangible employment action by Defendants in this case, the employer may here assert an affirmative defense that (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). The Plaintiff's ability to reach a trial (as will be discussed, infra) should survive a motion for summary judgment when sufficient facts are alleged to establish both Defendants' supervisory involvement in the harassment and

factual issues as to the Defendants' lack of "reasonable care" and that Plaintiff acted reasonably to stop the harassment.

This approach does not rely on the prior distinctions between "quid pro quo" and "hostile environment" sexual harassment – and in this case, Plaintiff has alleged factual allegations of ongoing harassment for <u>several years</u> duration, as well as documenting supervisors' threats and misstatement of her based substantially upon sexual harassment.

<u>SUMMARY of Pattern of Abuse (Attached )</u>

The rationale for holding an employer liable is that a supervisor can make a tangible employment decision only because of his role as an agent of the employer: "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation." See id. at 761-62. The Court went on to explain explicitly:

> *Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.*

Id. at 762.

The basic test of a "tangible employment action" is an action, or pattern of acts, that can be taken only by a supervisor, as opposed to acts by a coworker. Id. See also 1 LINDEMANN & GROSSMAN'S EMPLOYMENT DISCRIMINATION LAW 518 (Philip J. Pfeiffer et al. eds., Cumulative Supp. 2000)(a tangible employment action, under Ellerth and Faragher, "is the type of action a supervisor normally would take . . .").

In this case, the record shows that Plaintiff's immediate supervisor, Cliff Richer used his position as her supervisor to force her to face continuing sexual harassment at her work station, in personal meetings in his office, and repeatedly threatened to fire? her. With the backing of Bud Butller ( From Human Resources : )

Richer made Plaintiff's working conditions even more intolerable, by encouraging rather than inhibiting co-workers from continuing their harassment. Richer's power rested entirely in the authority to fire Plaintiff, based on Richer's agency relation with Defendant Corporations. The factual paradigm alleged by Plaintiff here comports with the "tangible employment action" doctrine of Faragher and Ellerth.

The Court's description of a tangible employment action as involving "a significant change in employment status," in its discussion in Ellerth, further supports the factual analysis that this case presents a tangible employment action. 524 U.S. at 761.

In a very real sense, Plaintiff's employment status suffered a significant, tangible change: as an added 'requirement' of her job, she was compelled to seek "Dr Care : and

complain to every supervisor . The actions of her supervisor consequently had a direct economic impact on her: to retain her job and income, she had to submit to these changed work conditions.[1] The Court speaks of a "significant change," it includes "failing to promote" as an example. In a "failure to promote" situation, the employee's job status has changed similarly to the way Plaintiff's job changed here: in both a "failure to promote" and a "failure to terminate," the employee's pay, benefits, etc. remain the same, but a tangible employment action has occurred nonetheless if the decision was based on impermissible harassment.

The infliction of direct economic harm is one common prerequisite to Plaintiff's stating of an actionable tangible employment action: "A tangible employment action in *most* cases inflicts direct economic harm." Ellerth, 524 U.S. at 762 (emphasis added). But other issues, present in this case, also demonstrate the criteria for nonfinancial elements of a hostile, harassing workplace. Both Ellerth and Faragher include examples of tangible employment actions that do not involve "pocketbook" harm, such as "work assignment" and "reassignment with significantly different responsibilities." Id. at 761; Faragher, 524 U.S. at 790. See also Durham Life Insurance Co. v. Evans, 166 F.3d 139, 153 (3d Cir. 1999) (economic harm is *not* necessarily the "sine qua non" of a tangible employment action).

Ellerth also distinguished between cases where the employees refusing sexual advances (and suffered job changes such as termination, demotion, or decrease in wages and benefits) and cases where Plaintiffs suffered "bruised egos" or demotions without change in pay or benefits. Thus, the court was stating that ensuing job detriments must be more than de minimus to constitute a tangible employment action. Ellerth, 524 U.S. at 761.

*Both* financial and emotional conditions, *not* de minimis or "brusied ego" conditins, are the case in the instant case, in which the changes consisted of the addition of a hostile work environment, continued exposure to threats of sexual contact or even violence, unsafe working conditions, diminished overtime, cleaning the men's restroom with no cognizance as to possible sexual harassment to the subordinate's job duties as a condition of retaining her employment. Again An unsafe : threatening boss : With the backing of Bud Butler

2. The Rationale of Faragher and Ellerth Reflect the Development of Liability of Employers In Hostile Work Environment Cases Involving Sexual Harassment

*"The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving (sex discrimination)... we think it prudent to import the concept of a tangible employment action for the resolution of the vicarious liability issue we consider here."* Ellerth, 524 U.S. at 761.

Both the Faragher and Ellerth opinions make it clear that the examples of tangible employment actions listed are not exhaustive. See Faragher, 524 U.S. at 808 ("such as discharge, demotion . . . ."); Ellerth, 524 U.S. at 761 ("such as hiring, firing, failing to promote"). Ellerth expressly noted that the question it was reviewing was "[w]hether a claim of quid pro quo sexual harassment may be stated under Title VII . . . where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions or privileges of

employment as a consequence of a refusal to submit to those advances?" 524 U.S. at 753 (emphasis added). The answer is clearly "yes." In the instant case, Plaintiff has even specifically alleged and documented a series of extensive factual detrimental changes in her "compensation, terms, conditions, and privileges of employment."

In short, there is presented in this case a factual nexus between: (a) the Defendants' supervisory tolerance of sexual harassment, (b) the Defendants' supervisory tangible employment actions, and ( c )Plaintiff's attempts to stop the harassment and hostile work environment. Showalter v. Allison Reed Group, Inc., 767 F. Supp. 1205 (D. R.I.), aff'd sub nom. The EEOC (to be discussed, infra) also supports this nexus, essentially applying the strict liability of employers through supervisor harassment.

In Johnson v. Booker T. Washington Broadcast Co., 234 F.3d 501, 508 (11th Cir. 2000), the Court equated "harassment that does result in a tangible employment action" to conduct "traditionally referred to as 'quid pro quo' harassment". This is also the express standard now adopted by the EEOC (see Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors § IV(B)(June 18, 1999), available at http://www.eeoc.gov/docs/harassment.html (noting that submission to and rejection of supervisor sexual harassment, if resulting in tangible employment action, "previously would have been regarded as 'quid pro quo.'"). Also see, e.g., Nichols, 42 F.3d 503; Karibian v. Columbia University, 14 F.3d 773 (2d Cir. 1994); Giordano v. William Paterson College, 804 F. Supp. 637 (D. N.J. 1992);. Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4 (1st Cir. 1993).

Four years before the Supreme Court decided Faragher and Ellerth, the Second

Circuit ruled that an employer must be held liable where an employee submits to her supervisor's sexual harassment in order to keep her job. Karibian v. Columbia University, 14 F.3d 773 (2d Cir.), cert. denied 512 U.S. 1213 (1994). In Karibian, the plaintiff alleged that her supervisor had coerced her by implicitly threatening to fire her if she did not give in to his harassment. Id. at 776-80. The district court granted summary judgment for the defendant on the ground that these facts did not constitute quid pro quo harassment because the plaintiff had suffered no "economic detriment" as a result of the harassment. The Appeals court reversed and remanded.

The Court of Appeals began its analysis by outlining the rules governing quid pro quo claims in the Second Circuit at that time:

> [Q]uid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.' Accordingly, . . . a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting her compensation, terms, conditions or privileges of her employment. Because the quid pro quo harasser, by definition, wields the employer's authority to alter the terms and conditions of employment . . . the law imposes strict liability. . . .

Id. at 777-78.

The Court then reasoned that a supervisor's conditioning of the terms and conditions of a subordinate's job on her response to his sexual harassment is just as unlawful under Title VII if she *submits* to those harassment as if she *rejects* them, even though in the submission case the same kinds of economic detriments (such as job loss) are unlikely to be available to support the claim. The Court explained:

> *True, in a typical quid pro quo case, the employee who refuses to submit to her supervisor's advances can expect to suffer some job-related reprisal. Accordingly, in such 'refusal' cases, evidence of some job-related penalty will often be available to prove quid pro quo harassment. But that is not to say that such evidence is always essential to the claim. In the nature of things, evidence of economic harm will not be available to support the claim of the employee who submits to the supervisor's harassment. . . . The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not. Under the district court's rationale, only the employee who successfully resisted the threat of sexual blackmail could state a quid pro quo claim. We do not read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence.*

Id. at 778 (citations omitted, emphasis added).

The Court continued:

> The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job.

Id.

The Court concluded that the plaintiff, by alleging that the terms and privileges of her job depended on her continued sexual responsiveness to her supervisor and that her supervisor had "implicitly threatened to fire her and damage her career if she did not comply," had alleged sufficient facts to allow her case to go to trial. Id.

Significantly, in reaching this conclusion, the Court cited Showalter v. Allison Reed, 767 F. Supp. at 1212, for the proposition that "[t]he obvious tangible job benefit the plaintiffs received for succumbing to the harassment was the retention of their employment." Karibian at 778. In that case the only tangible effect of the sexual harassment was the "new condition" the harassment imposed on the plaintiffs: "if they wanted to keep their jobs, they needed to comply with the condition of sexual harassment." Showalter, 767 F. Supp. at 1212.

The rule articulated in Karibian, is clear: where the evidence establishes that an employer has conditioned an employee's terms of employment -- including her retention of her job -- upon her submission to unwelcome sexual advances, a harassment claim has been made out and the inquiry into the employer's liability ends.

Karibian *expressly* rejected the contention that a plaintiff must show "actual, rather than threatened economic loss," reasoning that requirement was appropriate only in "refusal" cases where such evidence would necessarily be available and that such a rule placed undue emphasis on the victim's response to sexual harassment. Karibian, 14 F.3d at 778-79. Courts universally hold employers liable for this conduct because the supervisor is deemed to be acting on behalf of the employer. Id. at 78

In addition, just as the working conditions of the plaintiff in Karibian were altered as a result of the sexual conditions established by her supervisor, Plaintiff here began working only nights and weekends to avoid encountering Morabito (A196-97, 225, 267-68), and Morabito also interfered with her compensation by refusing to hand over her paychecks. (A292, 294, 317).

3. The EEOC Has Concluded That Similar Harassment Cases Present a Tangible Employment Action, and Case Law Since Faragher and Ellerth Supports This Conclusion As Well

Following the Supreme Court's decisions in Faragher and Ellerth, the EEOC issued new guidance on the issue of employer liability for harassment by supervisors. See generally 1999 EEOC Enforcement Guidance. In this guidance, the EEOC says the following about submission cases:

> If a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual harassment, the employer is liable and cannot raise the [Ellerth/Faragher] affirmative defense. The result

> is the same whether the employee rejects the harassment and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit. [Footnote: omitted] See Nichols v. Frank, 42 F.3d 503, 512-13 (9th Cir. 1994). Such harassment previously would have been characterized as "quid pro quo." It would be a perverse result if the employer is foreclosed from raising the affirmative defense if its supervisor denies a tangible job benefit based on an employee's rejection of unwelcome sexual harassment, but can raise the defense if its supervisor grants a tangible job benefit based on submission to such harassment. The Commission rejects such an analysis. In both those situations the supervisor undertakes a tangible employment action on a discriminatory basis.

Id. at §IV(B).

In short, the EEOC draws the link between the old "quid pro quo" analysis and the current "tangible employment action" framework

As a well-reasoned interpretation of Title VII by the agency charged with enforcing it, this Court is entitled to take notice of EEOC's guidance. See, e.g., Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986); EEOC v. Comm. Office Prods., 486 U.S. 107, 115 (1988); McMenemy v. City of Rochester, 241 F.3d 279, 284 (2d Cir. 2001); Karibian, 14 F.3d at 777. The Supreme Court has explained the rationale for this deference as follows:

> *As an administrative interpretation of the Act by the enforcing agency, these*

> *Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance.*

Meritor, 477 U.S. at 65 (citations omitted).

Rejection of EEOC guidelines has occurred only in limited circumstances: where the EEOC has wavered between inconsistent positions, where the EEOC's interpretation is contrary to the plain meaning of a statute, or where the EEOC's interpretation is unreasonable. See, e.g., EEOC v. Arabian American Oil Co., 499 U.S. 244, 257 (1991) (inconsistent positions; contrary to plain meaning of the statute); EEOC v. Comm. Office Prods., 486 U.S. 107, 115 (1988) (EEOC interpretation "need only be reasonable to be entitled to deference"). None of these circumstances is present here.

The EEOC's interpretation, as demonstrated herein, is eminently reasonable and is not contrary to the plain meaning of Title VII. Moreover, the EEOC has been consistent in its view that an employer is strictly liable where a supervisor demands and receives sexual favors from an employee in return for continued employment or a job benefit. See, e.g., EEOC 1980 Guidelines, 29 C.F.R. §1604.11(a)(2)&(c).

After Ellerth and Faragher, the courts have interpreted "tangible employment action" in terms of the capacity to do one's work effectively. Durham Life Insurance Co. v. Evans is an example. 166 F.3d 139, 144 (3d Cir. 1999). In Durham, the plaintiff's supervisors had "stripped her of the support she needed to do her job" by firing her secretary, taking away

her office, assigning her "lapsed accounts" and "misplacing" some of her files. Id. at 144, 153. In concluding that each of these actions independently constituted a tangible employment action, the court explained that "[t]he concept of a tangible adverse employment action is not limited to changes in compensation . . . 'Tangible adverse employment action' includes the loss of significant job benefits or characteristics, such as the resources necessary for an employee to do his or her job."

In this case, Plaintiff has specifically pled that her supervisors increasingly denied her advancement opportunities as well as opportunities to do her work at a high level of performance:

A# complaints on overtime : In 2000-2001-2002-2003-2004

A# Told D'anna Soehnge ( head of human resources ) Guns violence 2001

2002 Joan Chaffee : Intimidated by Paul Cardin (the man who held the gun ) Put in a formal complaint

2003 Plaintiff talked To Mike Mcguire : After threats made Bud Butler of Human resources ..

2004 Plaintiff complained to Bob Ringan ( The company fired him weeks latter

Plaintiff complained to Head of Human Resourses : D"anna Soehnge The plaintiff continued to call her and complain till D'anna said there is "No SILVER Bullet" to your problem "

The Seventh Circuit in Molnar v. Booth, 229 F.3d 593, 597-98, 600 (7thCir. 2000), found that a school principal took a tangible employment action by confiscating a student teacher's art class supplies after she spurned his sexual advances. The court also concluded that a negative performance evaluation, although later rescinded, constituted a tangible employment action. Id. The Eleventh Circuit has held that the transfer of a radio disc jockey to a different shift may constitute a tangible employment action even absent loss of compensation or other job benefits. Johnson v. Booker T. Washington Broad. Serv., 234 F.3d 501, 512 (11th Cir. 2000). Another federal court concluded that the assignment of extra and less desirable work "may be considered a tangible employment action akin to a demotion or a reassignment entailing significantly different job responsibilities." Glickstein v. Neshaminy School Dist., 80 Fair Emp. Prac. Cases (BNA) 67, 1999 WL 58578, 14 (E.D. Pa. 1999).

The interpretations of "tangible employment action" by the EEOC and the courts thus provide further support for the conclusion that a tangible employment action has occurred on the facts presented here.

Caridad v. Metro-North Commuter Railroad, 191 F.3d 283 (2d Cir. 1999), cert. denied 529 U.S. 1107 (2000). In Caridad, a hostile environment case, the court held that a constructive discharge is not a tangible employment action within the meaning of Faragher and Ellerth for several reasons, including that co-workers, as well as supervisors, can cause a constructive discharge, and that although the plaintiff in Ellerth had alleged she had been constructively

discharged, the Supreme Court concluded she had not alleged a tangible employment action. Id. at 294. But the Court also noted that extremely "dangerous" conditions may constitute a reason to waive the general rule against regarding a constructive discharge as a tangible employment action. The instant case, similarly, also involves an allegation of constructive discharge, and also involves conduct available only to this Plaintiff's supervisor (conditioning a subordinate's retention of her job on her submission to stop making complaints about harassment and alleged sexual misconduct by supervisors.) And while the court also noted that a constructive discharge is not ratified or approved by the employer, it did not say that express ratification or approval by the employer is a sine qua non of a tangible employment action. Nor is there any authority in Faragher or Ellerth to support that proposition; on the contrary, the Court used qualifying language, stating that "[t]he decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes." Ellerth, 524 U.S. at 762 (emphasis added). Furthermore, in this instant case, Plaintiff has documented real concern for her physical safety at the workplace, as a direct result of the original pattern of harassment...even offering evidence that weapons were being used at the site (A Gun dealer : selling guns : at work : With again the knowledge of union and Bud Butler : . Summary judgment on such an issue is not appropriate, where a highly complex issue (involving constructive discharge and the existence of a tangible employment action) are involved, and the stated facts are at great variance. *See, for example, Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) which: (1) clearly places credibility determinations within the province of the fact finder; (2) permits the fact finder to infer the ultimate finding of unlawful discrimination

based on the *prima facie* case combined with sufficient evidence of the falsity of the stated reason *for* the employment action and (3) requires no additional independent evidence of discrimination by the Plaintiff in this case?

Nor should summary judgment be used to set a comparatively high bar for a Plaintiff, who attempted to keep her job while simultaneously improving the work environment for any other women seeking employment in a traditionally male-dominated workplace. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297 (3d Cir. 1997)("(W)e 'do not read Title VII to punish victims of sexual harassment who surrender to unwelcome sexual encounters. . . . The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not.'"); Bouton v. BMW, 29 F.3d 103, 106-07 (3d Cir. 1994)(following Second Circuit approach); Bowerman v. Industrial Towel Supply, Inc., 1996 U.S. Dist. LEXIS 4662, *11-12 (W.D. Va. 1996)(same). See also 1999 EEOC Enforcement Guidance at § IV(B) ("It would be a perverse result if the employer is foreclosed from raising the affirmative defense if its supervisor denies a tangible job benefit based on an employee's rejection of unwelcome sexual harassment, but can raise the defense if its supervisor grants a tangible job benefit based on submission to such demands.")

Moreover, a legal rule that placed a larger burden on a plaintiff who is able to resist her supervisor's sexual harassmen actually suffers as great an injury, in some respects, as the employee who does not resist. The woman who actively resists unwanted sexual harassment in the work place often suffers a unique harm.

Indeed, while being subjected to supervisor Ed Bolduc's (et al) sexual innuendos, and Bruce Wilde's failure to address co-worker harassment, the Plaintiff suffered documented injuries including anxiety and fear : Threats of "Told I will be killed " migraine headaches ;Hyper ventilating , and Shaking : so apparent That the plaintiff was told she has mercury poisoning (2003-2004): Crying in Nurses office Scared to be alone with boss . Plaintiff was so disturbed by these events that she sought <u>psychiatric</u> help : Who pulled her out of work : and wrote " The harassment must stop "

B. The Plaintiff has Plead Sufficient Factual Allegations of Sexual Harassment to Survive Defendants' Summary Judgment Motion

Assuming arguendo, there is no tangible employment action by Defendants, the Defendants/Employer may assert an affirmative defense that (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher v. City of Boca Raton, 524 U.S. 775 (1998)

In this case the Plaintiff applied for jobs:_ For the first time in 14 years : could not have a 30 day trial period given to union employees to show They could do the job :( Told she hired a lawyer) "Threatened : Again No jobs offered All workmans compensation denied during last two years ( Even when hurt on a company vehicle ) This ended on December 7 2004 : in an emergency room with the police called after seeing a gun on am employee :

A court should not limit a Defendant's potential liability to the most egregious sexual harassment conduct imaginable, but instead to potentially actionable conduct supported by the evidence, or reasonably deduced from the pleadings and to be presented at trial. In this case, for example, Plaintiff has also alleged several instances where physical fear for her life is alleged. (A weapons allegation). Girden v. Sandals Int'l, 262 F.3d 195, 203-04 (2d Cir. 2001) (jury charge erroneously implied that only rape of a plaintiff was actionable; unwanted kissing could also constitute assault).

In neither of the two preceding instances have the Defendants established that they are entitles to the relief a granting of summary judgment would provide. In one instance, the Defendants cannot show conclusively that they acted to prevent the behaviors complained of, nor that the Plaintiff acted unreasonably in seeking to protect her employment. Instead, triable issues of fact exist.

## III. CONCLUSION

Under Faragher and Ellerth and other relevant authority, the infliction of sexual harassment by a supervisor upon a subordinate employee, whether acceding to the abuse or not, upon threat of termination or other detrimental alteration of employment conditions, constitutes a tangible employment action for which the employer is strictly liable.

The sexual harassment jurisprudence that has evolved under Title VII is intended to ensure that no one is required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living" and thereby to "eliminate the arbitrary barrier to sexual equality at the workplace" that sexual harassment creates. Meritor Savings Bank v.

Vinson, 477U.S. 57, 67 (1986)(quoting Henson v. Dundee, 682 F.2d 897, 902 (11th Cir. 1982)). It would be impossible to square with this objective a rule that allowed an employer to escape liability where an employee has been forced to submit to unwanted harassment with her supervisors' participation and encouragement of co-worker conduct, in order to keep her job.

In all of these scenarios, the supervisor has used the power of his position in an attempt to extort sexual favors from an unwilling subordinate – either in an unsuccessful attempt, where she refuses and then suffers a loss of her job or other penalties, or in a successful attempt, where she submits to his demands and either obtains job benefits she otherwise would be denied or (as here) keeps a job she otherwise would lose. In either of these scenarios, sexual blackmail is working in precisely the same way to erect an arbitrary barrier to sexual equality in the workplace. In all of them, the law must consider the employer equally responsible.

In Karibian, a court concluded that "the supervisor's conduct is equally unlawful under Title VII whether the employee submits or not." 14 F.3d at 778. As the Court noted, under the contrary rule adopted by the court below in that case (holding that there is no quid pro quo sexual harassment in a submission case because there is no economic detriment), an employee who is unable to resist the sexual advances of her supervisor would, "For economic reasons, most workers cannot simply abandon their employment – new jobs are hard to find." Nichols, 42 F.3d at 510.

"Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely , a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets "

Henson v Dundee , 682 F .2d 897,902 (1982)

Respectfully Submitted ,

Plaintiff Pro Se :Lynore Horn

88 Alger Ave East Greenwich RI 02821

CERTIFICATION

The undersigned certifies that a true copy of the with in document was served via certified mail . return receipt requested , This day August 27,2007 to Attorney Neal McNamara One citizens plaza Suite 500 Providence ,Rhode Island 02903

# TABLE OF AUTHORITIES

## CASES

Page

Bouton v. BMW,
29 F.3d 103 (3d Cir. 1994)....15
Bowerman v. Industrial Towel Supply, Inc.,
1996 U.S. Dist. LEXIS 4662 (W.D. Va. 1996)....15
Burlington Industries, Inc. v. Ellerth,
524 U.S. 742 (1998)....6
Caridad v. Metro-North Commuter Railroad,
191 F.3d 283 (2d Cir. 1999), cert. denied,
529 U.S. 1213 (2000)....14
Durham Life Insurance Co. v. Evans,
166 F.3d 139 (3d Cir. 1999)....9
EEOC v. Arabian American Oil Co.,
499 U.S. 244 (1991)....13
EEOC v. Comm. Office Prods.,
486 U.S. 107 (1988)....13
Faragher v. City of Boca Raton,
524 U.S. 775 (1998)....6
Giordano v. William Paterson College,
804 F. Supp. 637 (D. N.J. 1992)....11
Girden v. Sandals Int'l,
262 F.3d 195 (2d Cir. 2001)....16
Glickstein v. Neshaminy School Dist.,
80 Fair Emp. Prac. Cases (BNA) 67,
1999 WL 58578 (E.D. Pa. 1999)....12

Page

Harris v. Forklift Systems, Inc.
510 U.S. 17 (1993)....................6
Henson v. Dundee,
682 F.2d 897 (11th Cir. 1982)....................7
Johnson v. Booker T. Washington Broadcast Co.,
234 F.3d 501 (11th Cir. 2000)....................10
Karibian v. Columbia University,
14 F.3d 773 (2d Cir.), cert. denied,
512 U.S. 1213 (1994)....................6
Kurschinske v. Meadville Forging Co., W.D. Pa., No. 06-67, 6/21/07....................6
McMenemy v. City of Rochester,
241 F.3d 279 (2d Cir. 2001)....................13
Meritor Savings Bank v. Vinson,
477 U.S. 57 (1986) ....................6
Molnar v. Booth,
229 F.3d 593 (7th Cir. 2000)....................14
Nichols v. Frank,
42 F.3d 503 (9th Cir. 1994)....................13
Robinson v. City of Pittsburgh,
120 F.3d 1286 (3d Cir. 1997)....................15

Page

Showalter v. Allison Reed Group, Inc.,
767 F. Supp. 1205 (D. R.I.), aff'd sub nom. Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4 (1st Cir. 1993)....10

STATUTE

Title VII of the Civil Rights Act of 1964,
42 U.S.C. 2000e et seq....6

MISCELLANEOUS

EEOC Enforcement Guidance:
Vicarious Employer Liability for Unlawful Harassment by Supervisors s IV(B)(June 18, 1999), available at http://www.eeoc.gov/docs/harassment.html....10

EEOC 1980 Guidelines,
29 C.F.R. §1604.11(a)(2)&(c)....13

1 LINDEMANN & GROSSMAN'S EMPLOYMENT DISCRIMINATION LAW
(Philip J. Pfeiffer et al. eds., Cumulative Supp. 2000)....9