UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE I. HORN | : | |
| | : | |
| v. | : | C.A. No. 04-434S |
| | : | |
| SOUTHERN UNION CO. and | : | |
| NEW ENGLAND GAS CO. | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Before this Court is Defendants Southern Union Co. and New England Gas Co.'s Motion for Summary Judgment (Document No. 110) pursuant to Fed. R. Civ. P. 56. Plaintiff Lynore I. Horn filed an Objection to the Motion. (Document No. 112). This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). A hearing was held on October 12, 2007. After reviewing the Memoranda submitted, listening to the arguments and considering relevant legal research, I recommend that Defendants' Motion for Summary Judgment (Document No. 110) be GRANTED.

## I. Background

Plaintiff originally filed her Complaint on June 4, 2004 in Rhode Island Superior Court. At that time, she had a pending charge with the Rhode Island Commission for Human Rights alleging violations of the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1 et seq. On October 8, 2004, Defendants removed the case to this Court. Plaintiff was subsequently issued a Notice of Right to Sue by the Rhode Island Commission for Human Rights on her FEPA claim, and she moved to amend her Complaint in a timely fashion to include that claim. Plaintiff's Amended Complaint alleges five claims against Defendants. See

Document No. 8. Counts I and IV allege disparate treatment under the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 et seq., and FEPA. Counts II and V allege gender-based hostile work environment under RICRA and FEPA, and Count III alleges intentional infliction of emotional distress ("IIED"). Plaintiff's allegations span her over fifteen years' employment with New England Gas Company and its corporate predecessor, Providence Gas Company.

Prior to filing their Motion for Summary Judgment, Defendants filed a Motion to Stay Proceedings (Document No. 101), along with a simultaneous Motion to Certify Question to the Rhode Island Supreme Court ("RISC") (Document No. 102) on the issue of whether RICRA has a one- or three-year statute of limitations. Defendants contended that if RICRA had a one-year limitations period, many of Plaintiff's claims would fail. On July 14, 2006, District Judge Smith granted Defendants' Motion to Certify Question and stayed the proceedings pending a response from the RISC. (See Document Nos. 114, 115, 116 and 118).

The RISC issued its decision on the certified question on June 27, 2007 and held that the statute of limitations applicable to employment discrimination claims asserted under RICRA is one year. Horn v. Southern Union Co., 927 A.2d 292 (R.I. 2007). Thereafter, Defendants filed a Motion to Lift Stay and Set Date for Filing of Reply Brief. (Document No. 124). On July 31, 2007, Defendants submitted a reply to clarify the remaining legal issues in light of the RISC's opinion. (Document No. 128).

## II. Summary Judgment Standard

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc., 43 F.3d at 735; Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).

To oppose a motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson, 477 U.S. at 256-257. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina- Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**III. Compliance with Local Rule Cv 56**

Local Rule Cv 56 requires a party moving for summary judgment to file a "Statement of Undisputed Facts that concisely sets forth all facts that the movant contends are undisputed...." See LR Cv 56(a)(1). Any fact alleged in the movant's Statement of Undisputed Facts is deemed admitted unless expressly denied or otherwise controverted by a party objecting to the Motion. LR Cv 56(a)(3). The Rule provides that a fact that is controverted or denied must be, "supported by affidavit or other evidentiary materials." LR Cv 56(a)(4) In addition, the "objecting party also may file a Statement of Disputed and/or Undisputed Facts setting forth disputed facts and/or additional undisputed facts that the objecting party contends preclude summary judgment." Id. at (a)(4). These Local Rules carry the force of law and are binding upon the litigants and upon the court itself.[1] Barber v. Verizon New England, Inc., NO. Civ.A. 05-390-ML, 2006 WL 3524465 (D.R.I. Dec. 6, 2006) (quoting Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994) (citations and footnote omitted)).

[1] This Court previously informed Plaintiff that she "should promptly familiarize herself with this Court's Local Rules and the Federal Rules of Civil Procedure as she is now representing herself in this case and is responsible for complying with those Rules going forward." See Document No. 60.

In compliance with the Local Rule, Defendants filed a Motion for Summary Judgment along with a Memorandum of Law (Document No. 110) and a Statement of Undisputed Facts (Document No. 111). Plaintiff objected to Defendants' Motion and filed a Memorandum of Law in Opposition (Document No. 112) and a Statement of Disputed Facts. (Document No. 113). Plaintiff's Statement of Disputed Facts is a three-page document containing eighteen conclusory and unsupported "fact" statements. Plaintiff's Statement of Disputed Facts does not refer to any evidentiary material or affidavit. Although there are various exhibits attached to both her Motion for Summary Judgment and her Statement of Disputed Facts, Plaintiff's submission does not comport with the Local Rules, since the exhibits she submitted are not an "affidavit or other evidentiary material." Because Plaintiff did not properly support her facts, the Court adopts the facts provided in Defendants' Statement of Undisputed Facts. See Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000).

**IV. Statement of Facts**

Plaintiff is a female who was a Rhode Island resident at all times relevant to this litigation. See Document No. 111 at ¶ 1. Defendant New England Gas Co. is a d/b/a of Southern Union Co. Id. ¶ 3. Defendants Southern Union Co. and New England Gas Co. are the corporate successors to Providence Gas Co. ("Providence Gas") (collectively the "Gas Company"). Id. ¶ 4. Plaintiff commenced her employment with the Gas Company in 1989 and worked there, in various capacities, until December 2004, when she went on extended leave. She was ultimately terminated in December 2005. Id. ¶ 10. At all times during Plaintiff's employment with the Gas Company, she was a member of Local 12431 of the United Steelworkers of America, which had

several collective bargaining agreements with the Gas Company. Article III of each of the collective bargaining agreements contains a non-discrimination clause. Id. ¶ 9.

**A. April 1989 through September 2002**

During the relevant time frame, the Gas Company operated several facilities in Providence, Rhode Island in connection with their business. Id. ¶ 6. Among these facilities were buildings on Dexter Street and Weybosset Street. Id. ¶ 7.

Plaintiff worked in several different departments over the course of her approximately fifteen-year career at the Gas Company. Plaintiff began her employment with the Gas Company in April 1989 as a cleaning person working the night shift, and her supervisor was Ed Bolduc ("Bolduc"). Id. ¶ 11. Plaintiff worked as a cleaning person from April 1989 to approximately October 1989. Id. ¶ 12. In October 1989, Plaintiff transferred to a meter reader position working the day shift under the supervision of Bob Crowley. Id. She worked as a meter reader until approximately June 1990. Id. ¶ 13.

In June 1990 Plaintiff's position changed again, to night watchperson at the Weybosset Street facility, and her supervisor was Bolduc. Id. In approximately January 1992, Plaintiff's job title changed to Facilities Maintenance Person, and her duties changed to "mostly cleaning." Id. ¶ 14. Her work location and her supervisor did not change when she became a Facilities Maintenance Person. Id. On approximately March 1, 1992, Plaintiff changed from the Weybosset Street facility to the Dexter Street facility, but continued to work within the Facilities Maintenance Department, and Bolduc remained her supervisor. Id. ¶ 15.

In 1998, Plaintiff changed to the day shift, although her duties and supervisor remained the same. Id. ¶ 16. She remained in this position until approximately May 1999. Id. ¶ 19.

While in that position, Plaintiff alleges that she was harassed in a sexually-charged manner and that she was physically threatened by coworkers. Id. ¶ 17. She also alleges that Bolduc frequently criticized her and treated her unfairly while she was a Facilities Maintenance Person. Id.

In approximately May 1999, Plaintiff applied for and was transferred to the Customer Service Department where she spent five and one-half months training, attending courses and traveling to fix gas appliances. Id. ¶ 19. Her supervisor in the Customer Service Department was Dave Lauble. Id.

In October 1999, Plaintiff returned to the Facilities Maintenance Department where she worked the day shift at the Dexter facility, again under the supervision of Bolduc. Id. ¶ 22. During this time, Plaintiff alleges that Bolduc either ignored her or lost his temper when he spoke with her. She claims that he used aggressive and degrading language toward her, and that Bolduc criticized her, but not her coworkers. Id. ¶ 23.

Around September or October 2000, while still under the supervision of Bolduc, Plaintiff moved from the Dexter Street facility to the Weybosset Street facility where she worked the day shift for approximately three months, and took night courses to obtain a boiler operator's license. Id. ¶ 26. In May 2001, Gary Sunday ("Sunday") began working with Bolduc, and the two of them effectively acted as co-supervisors until Sunday officially took over when Bolduc retired on June 30, 2001. Id. ¶ 31. Plaintiff remained in Facilities Maintenance at Weybosset Street under the supervision of Sunday from June 2001 through August 2002. Id. She testified that the environment at Weybossett Street was "more...sexual" and that it was "permissible to talk about women, women's chests...[and the] physical features of a woman." Id. ¶ 28.

During her time at Weybosset Street, Plaintiff filed two grievances concerning overtime. Id. ¶ 30. First, on March 25, 2001, Plaintiff alleges that she was passed over for overtime work. Although Bolduc called Plaintiff, she did not answer her phone and he did not leave her a message. Id. Second, Plaintiff filed a grievance concerning the fact that she was not being paid overtime to take courses to receive a boiler operator's license. Id. Both of the grievances were resolved through the normal process. Id. Plaintiff also claims that during this time period Bolduc yelled at her because she was singing and humming while she was working. Id. ¶ 34. Finally, during this period, Plaintiff claims she was issued a written warning by Sunday regarding her unsatisfactory performance while painting on May 26, 2001. Id. ¶ 35. Plaintiff does not allege that Sunday directed any inappropriate or vulgar language at her. Id. ¶ 38. However, she did file a grievance on July 17, 2002 alleging that Sunday violated the collective bargaining agreement by failing to call Plaintiff for work when she was entitled. Id. ¶ 40. Apparently, Sunday attempted to reach Plaintiff to fix a leaking urinal, but when he was unsuccessful at contacting her and her coworker, Sunday fixed the urinal himself. Sunday stated that the urinal was leaking and could have caused damage or posed a risk to someone walking in the area. Id. ¶ 40. Ultimately, Plaintiff was paid four hours' time to resolve the grievance. Id.

On or about September 1, 2002, Plaintiff moved to the Meter Reading Department, but remained in that position for less than two weeks. Id. ¶ 42. Frank Lisi was her supervisor as a Meter Reader. Id.

**B. September 2002 through December 2004**

On or about September 15, 2002, Plaintiff moved into the Leak Survey Department where she was under the supervision of Cliff Richer ("Richer"). Id. ¶ 43. In leak survey, she

was responsible for monitoring and responding to suspected and reported gas leaks in and throughout Rhode Island. Id. Plaintiff transferred to leak survey at approximately the same time as several other employees who were new to the Department. Id. ¶ 44. Among the new employees to leak survey during this time period were Barbara Alderman ("Alderman"), Jim Dawley ("Dawley") and John Langford ("Langford"). Id. The employees already in the Leak Survey Department included Merle Dean ("Dean"), Donald Clement and Elliot Kemp. Id.

Plaintiff's complaints in leak survey involve the conduct of her supervisor, Richer, and her coworkers, Dean and Alderman. Plaintiff testified that there was a "bullying atmosphere" in leak survey, and when asked to describe what she meant, she testified: "The best way I can answer your question is, it was like working in a bar....The boss [Cliff Richer] and Merle Dean had a special relationship and the bullying atmosphere was a back and forth...." Id. ¶ 45.

With respect to her coworker Dean, Plaintiff testified: (1) he made comments about the "tits on that one," referring to an actress in a movie he had seen with his wife the previous night; (2) he talked about a story that circulated around the Company regarding a man getting dragged around the shower by his penis; (3) he sang alternate lyrics, such as "Oh, I want to fuck my wife today,'' to "oldies" that were on the radio; and (4) he mentioned, while driving with Plaintiff, something about a "black woman [who had been] raped off the bridge." Id. ¶ 50.

As to Richer, Plaintiff's supervisor, Plaintiff first alleges that Richer called her "one-oar."[2] Id. ¶ 46. Apparently, Plaintiff was mistakenly called "one-oar" by a waitress at a restaurant, laughed about it with Dean, and even referred to herself as one-oar. Id. ¶ 47. Richer states that he was unaware that Plaintiff was upset with the nickname "one-oar" until he was

[2] For examples, Plaintiff claims Richer said things such as, "Do you have your oar in the water? Are we all here today? Oh, One-Oar has showed up." Id. ¶ 46.

alerted, in June 2003, by his superior, Mike McGuire, that Plaintiff had lodged a complaint. Id. Richer then immediately apologized to Plaintiff, told her that he wished she had informed him that this bothered her and stopped using the nickname. Id. When asked whether Richer referred to the other women by nicknames, Plaintiff indicated that he did not refer to Alderman, the only other woman who worked with Plaintiff in leak survey, by any nickname. Id. ¶ 48 Plaintiff also testified that she took offense at Richer's alleged comment that Plaintiff must have been involved in drinking and drugs because she was brought up in the sixties and seventies. Id. ¶ 49.

More specifically, while in leak survey, Plaintiff alleges disparate treatment with respect to: (1) assignment of survey routes; (2) assignment of vehicles and hence, overtime; and (3) the requirement that Plaintiff spend three weeks training in construction and maintenance ("C&M"). Id. at 51.

First, Plaintiff alleges that she was assigned unfavorable survey routes. Id. ¶ 52. She alleges that Richer did not assign her routes near her home, sent her on longer routes to Westerly and also sent her on routes through "bad" neighborhoods. Id. Plaintiff testified: "When I came in and I wasn't well, it was obvious I had the flu, or something, [Richer] would send me to the worst section of South Providence where there's not even a decent bathroom. He knew I lived in Newport. And when he found that out, I never went to Newport." Id. Plaintiff also testified that when Alderman, her female coworker, "was not feeling well, Cliff would say, [t]oday, I'll make sure you have a route in East Providence so you can go home. When you're done with your day you can go home and lie down and just come in at the end of the day." Id.

Second, Plaintiff complained about the vehicle she was assigned in leak survey. Id. ¶ 53. Plaintiff testified that she "assumed" vehicle assignments were done on the basis of seniority or

based on "previous knowledge in other departments." Id. However, leak survey vehicle assignments were distributed on an ad hoc basis, and not by seniority. Id.

When Plaintiff began working in leak survey, the Department had four of its own trucks and eight leak surveyors. Id. ¶ 54. Three of those trucks were already assigned to three employees that were there when Plaintiff arrived in leak survey. Id. Following Richer's arrival in 2002, leak survey had more leak surveyors than vehicles, and in order for each employee to have a vehicle, leak survey would periodically borrow vehicles from other departments, on a temporary basis. Id. Many of the borrowed vehicles were older, and, at times, lacked heat and/or air conditioning. Id.

James Dawley and Kenny Strobel ("Strobel"), the two employees who arrived in leak survey at roughly the same time as Plaintiff, used the trucks that they had used in their previous department, Customer Service. Id. ¶ 55. Plaintiff and Langford started working in leak survey at the same time and were given access to trucks from other departments. Plaintiff took a truck that was available from the Meter Reading Department. Id.

Plaintiff complained that Dawley was given the fourth leak survey truck even though she had more seniority with the Gas Company than he did. Plaintiff testified that Richer told her that he assigned the fourth survey truck to Dawley because he had customer service knowledge and that Plaintiff did not.[3] Id. ¶ 56.

Moreover, Plaintiff alleges that because of her vehicle assignment, she was denied overtime. Essentially, Plaintiff complained that "[y]ou cannot get overtime for a lot of jobs if

[3] Dawley worked in the Customer Service Department for approximately five years, while Plaintiff had five and one-half months' experience in Customer Service. Id. ¶ 56. The new employees in leak survey, like Dawley, Alderman and Plaintiff, were generally assigned walking survey, and driving survey was generally given to the more senior employees within the Department. Id. ¶ 57.

you do not have a driving survey vehicle" and because she was assigned a truck from meter reading, she was prevented from getting overtime work.[4] Id. ¶ 59. However, in 2004, Plaintiff worked virtually the exact amount of overtime hours as Donald Clement, an employee who drove a survey vehicle. Id.

Third, Plaintiff alleges that while she was working in leak survey she was assigned to work in Construction & Maintenance ("C&M") when other employees that were new to leak survey were not. Id. ¶ 51. From approximately November through March of each year, leak survey employees could be temporarily assigned to C&M as laborers, as needed. Id. Leak survey employees without C&M work experience are required to undergo training within that Department. Id. Dawley and Langford, the other new leak survey employees, were not required to spend three weeks in C&M because they had previously worked in that Department. Id. Plaintiff had no C&M experience, and Alderman had not successfully completed previous C&M training; therefore, both Plaintiff and Alderman received C&M training after arriving in leak survey. Id.

Finally, with respect to Plaintiff's coworker, Alderman, Plaintiff claims that in December 2004, Alderman called her a name and showed her a gun. Id. ¶ 60. Plaintiff does not remember whether Alderman said anything. Id. She left that day and never returned to work at the Gas Company. Id.

---

[4] Richer was responsible for assigning overtime. Id. ¶ 58. In determining who would be assigned overtime work, Richer generally followed the overtime list. That list, which was generally updated on a weekly basis, set forth the number of hours each leak survey employee had worked year to date. Id. It also stated whether the employee was on leave or on "light duty" and therefore should not be called for overtime. Id. Richer would call the "low overtime" person, i.e., the person who logged the least overtime hours year-to-date and was not listed as "do not call," as required by the collective bargaining agreement. Id. Due to the nature of gas leaks and similar emergencies, Richer would, if necessary, call the person in the field closest to the site or, alternatively, a person with certain experience necessary to deal with the situation at hand. Id. Plaintiff has not identified any competent evidence that Richer discriminated against her, or women in general, in the assignment of overtime work. Id.

**Analysis**

**A. Effect of the RISC's Response to the Certified Question**

The RISC's holding that there is a one-year limitation period applicable to employment discrimination claims under RICRA is binding as a matter of state law. In this action, Plaintiff first filed a FEPA charge on May 13, 2004 alleging sex discrimination and harassment. Plaintiff's state court complaint, alleging violations of RICRA, was filed on June 4, 2004. Both FEPA and RICRA have one-year limitations periods, and Defendants concede that the earlier-filed charge controls. Plaintiff bore the burden of filing her administrative charges within one year of the allegedly unlawful employment practices. Consequently, only those actions that occurred after May 13, 2003 fall within the relevant time period for Plaintiff's claims. The alleged acts which occurred prior to May 13, 2003 are time-barred absent application of an equitable exception, such as the continuing violation theory. See, e.g., Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 46 (1st Cir. 2005); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 405 (1st Cir. 2002).[5]

**B. Disparate Treatment**

Plaintiff alleges gender-based disparate treatment under both RICRA (Count I) and FEPA (Count IV). The statute of limitations which applies to these claims is one year, thus the cut-off date for Plaintiff's claims is May 13, 2003. Plaintiff, however, attempts to bring all of her allegations from her fifteen-year employment with the Gas Company within the limitations

[5] Case law developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq. is "routinely applied" to claims brought pursuant to FEPA and RICRA. See Kriegel v. State of R.I., 266 F. Supp. 2d 288, 296 (D.R.I. 2003) (applying federal analysis to claims under FEPA and RICRA); and Russell v. Enter. Rent-A-Car Co., 160 F. Supp. 2d 239, 265 (D.R.I. 2001) ("FEPA is Rhode Island's analog to Title VII and the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to those brought under FEPA.") (citations omitted). Thus, in its analysis, this Court will cite to cases interpreting Title VII.

period by alleging that the "continuing violation" theory applies to the gender-based disparate treatment claims that fall outside the limitations period. The Court disagrees.

In Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), the Supreme Court held that when an employee seeks redress for "discrete acts" of discrimination or retaliation, then the continuing violation doctrine may not be invoked to allow for recovery for acts that occurred outside the filing period. See also Miller v. New Hampshire Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002). Thus, if the complained-of conduct constitutes a "discrete act," then Plaintiff cannot, as a matter of law, utilize a continuing violation theory to resurrect these otherwise time-barred claims. The Court must therefore consider the allegations made by Plaintiff and whether those allegations are discrete acts.

In her Objection to the Motion for Summary Judgment, Plaintiff highlights the acts which she believes comprise her disparate treatment claim under a heading entitled, "Differential Treatment? Men v Woman." (Document No. 130 at 10). After reviewing the acts listed in Plaintiff's "summary" as well as analyzing all of the facts listed in the Statement of Undisputed Facts, the Court concludes that the various allegations that predate May 2003 constitute discrete acts. For example, in her "summary" Plaintiff alleges she had "1/5 of the overtime" of "just one co-worker a man" in the years 2000-2004. Denial of overtime is a discrete act. See Benjamin v. Brookhaven Sci. Assocs., LLC, 387 F. Supp. 2d 146, 154 (E.D.N.Y. 2005) ("[I]t is well-settled in the Second Circuit that alleged failures to compensate adequately...are discrete acts and, if untimely, cannot form the basis of a continuing violation claim."); and Bond v. Potter, 348 F. Supp. 2d 525, 529 n.5 (M.D.N.C. 2004) (holding that a denial of overtime pay is a discrete act of discrimination for limitations purposes). Aside from her complaints about the denial of

overtime, there do not appear to be any other facts alleged in her "summary" section which occurred prior to her employment in the Leak Survey Department.

The only possibly viable allegations, therefore, occurred during Plaintiff's employment in leak survey; which began on September 15, 2002 and ended in December 2004. The Undisputed Facts, however, do not indicate exactly when each of Plaintiff's allegations occurred. Assuming, arguendo, that all of Plaintiff's disparate treatment allegations, while she worked in leak survey are within the limitations period, the allegations still do not survive summary judgment.

While in leak survey, Plaintiff primarily claims she was a victim of gender-based disparate treatment with respect to: (a) Richer's assignment of vehicles (which she alleges, in turn, affected the amount of overtime she received); (b) Richer's assignment of survey routes; and (c) the requirement that she spend three weeks training in C&M. Document No. 111, ¶¶ 43-60.

A gender-based disparate treatment claim is based upon the three-step, burden-shifting framework. The first step requires that a Plaintiff establish a prima facie case by showing:

> (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications.

DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005) (quoting Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st Cir. 1994)). The burden of proving a prima facie case "is not especially onerous." DeCamp, 875 A.2d at 21 (quoting Ctr. for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998)). The second step of the burden-shifting

framework requires that the employer "offer a legitimate, nondiscriminatory reason for the adverse employment action." DeCamp, 875 A.2d at 21. The third step of the framework requires the employee to "convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." DeCamp, 875 A.2d at 21-22 (citing Casey v. Town of Portsmouth, 861 A.2d 1032, 1036-1037 (R.I. 2004)).

In turn, each of Plaintiff's leak survey allegations are considered.

**1. Assignment of Vehicles**

First, Plaintiff alleges that she was discriminated against with regard to the vehicle assignment in leak survey, and, as a result, she was denied overtime. Plaintiff meets the first two elements of the prima facie case: (1) as a female, she is a member of a protected class; and (2) she appears to have been in good standing on the date of the alleged assignments. However, Plaintiff fails to satisfy the third element because the assignment of disfavored vehicles is not an adverse employment action. In the First Circuit, "tangible employment actions," are "significant changes in employment status, including, but not limited to, hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34 (1st Cir. 2003); see also Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir. 2002) ("[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act...does not elevate that act...to the level of a materially adverse employment action"); Virostek v. Liberty Township Police Dep't/Tr., 14 Fed. Appx. 493, 504 (6th Cir. 2001) (assignment of an older police vehicle was not an adverse employment action); Rosales v. TXI Operations LP, No. Civ.A 303CV2923N, 2005 WL 598195, *4 (N.D. Tex. March 14, 2005) (rejecting "attempts to expand

the definition of 'adverse employment action' to include claims regarding working conditions, such as the alleged acts of [defendant] regarding [plaintiffs'] vehicles and work assignments."). Because she fails to satisfy the third prong of the prima facie case, Plaintiff's claim that she was discriminated against with regard to the assignment of vehicles fails as a matter of law.

Plaintiff also alleges that the assignment led to reduced amounts of overtime while in leak survey. Although a reduction of overtime hours would constitute an adverse employment action, it is undisputed that in 2004, Plaintiff worked virtually the exact amount of overtime hours as a male employee who drove a survey truck. Document No. 111 ¶ 59. Accordingly, Plaintiff has set forth no evidence that she received less overtime than her male counterparts. Plaintiff merely presents conclusory allegations that Richer discriminated against her on the basis of her sex in the apportionment of overtime work. There is no evidence that Richer failed generally to adhere to the "low-overtime" list absent legitimate exceptions, or, if he did so fail, that he specifically denied Plaintiff overtime opportunities on account of her gender. See Joens v. John Morrell & Co., 243 F. Supp. 2d 920, 949 (N.D. Iowa 2003) ("[Plaintiff] has designated no evidence beyond her very weak prima facie case of a[n overtime] disparity with a similarly situated male that suggests that her sex was the 'real reason' for the disparity....") (emphasis omitted). In fact, in 2004, Plaintiff worked a virtually identical number of overtime hours as Clement, who drove a coveted survey truck. Document No. 111, ¶ 59.

After reviewing all of the evidence in a light most favorable to Plaintiff, Plaintiff has failed to meet the prima facie standard regarding her claims of disparate treatment with respect to vehicle and overtime assignments.

**2. Route Assignments**

Next, Plaintiff claimed that Richer treated her unfairly with respect to survey route assignments. She alleges that he did not assign her routes near her home, sent her on longer routes, to Westerly, and also sent her on routes through "bad" neighborhoods. Document No. 111, ¶ 52. As with her claims regarding the assignment of vehicles and overtime, Plaintiff cannot establish the third element of the prima facie test that the route assignments constituted adverse employment actions. Moreover, even if Plaintiff was able to prove that this was an adverse employment action, Plaintiff has not identified competent evidence to support the fact that these assignments were based on her gender. Plaintiff has not alleged that only women, and not men, were sent to outlying locations and "bad" neighborhoods. In fact, Plaintiff's own statement undermines any inference that Richer treated her unfavorably because of her gender. Plaintiff testified that when Alderman was not feeling well, Richer assigned her routes near her home in East Providence. Plaintiff also testified that she received no such accommodation. Document No. 111, ¶ 52. Plaintiffs admission that Richer treated Alderman, a female, favorably with respect to route assignments is fatal to her disparate treatment claim.

**3. Construction and Maintenance Assignment**

Plaintiff's third claim essentially alleges that she was assigned to work in C&M when other employees new to leak survey were not. However, it is undisputed that the assignments to C&M occurred during the months of March and November 2002, and thus are time-barred. See Morgan, 536 U.S. at 110.

For all of these reasons, I find that there are no genuine issues of material fact presented, and that the Gas Company is entitled to the entry of summary judgment in its favor on the

Plaintiff's disparate treatment claims. Accordingly, I recommend that the District Court GRANT Defendant's Motion for Summary Judgment on Plaintiff's disparate treatment claims (Counts I and IV).

**C. Hostile Work Environment under RICRA and FEPA**

Plaintiff alleges a sex-based hostile work environment under RICRA (Count II) and FEPA (Count V) and again attempts to invoke the continuing violation theory. More specifically, Plaintiff alleges that she was "subjected to unwelcome sexual harassment that was sufficiently severe or pervasive so as to unreasonably interfere with [her] work performance and/or create an intimidating, hostile or offensive working environment." See Compl., ¶ 23. Defendants move for summary judgment on both counts arguing that the RISC's response to the certified question forecloses Plaintiff's attempt to invoke the continuing violation theory to avert summary judgment on her hostile work environment claim for the period of her employment prior to her arrival in leak survey. Document No. 128 at 6.

The RISC stated that, "[c]oncerning the creation of an abusive work environment, Title VII, and therefore FEPA and RICRA, are violated 'when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult'...that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment .'" DeCamp, 875 A.2d at 23. In order for work conditions "to be actionable...[the] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

There is no "mathematically precise test" for determining when conduct in the workplace moves beyond the "merely offensive" and enters the realm of unlawful discrimination. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). Rather, "all the circumstances" must be examined to determine whether an environment is "hostile" or "abusive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) (quoting Harris, 510 U.S. at 23). "Subject to some policing at the outer bounds," the jury should weigh the factors and decide whether the harassment was of a kind that would have affected the conditions of employment for a reasonable person. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19 (1st Cir. 2002) (quoting Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002)). However, "teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788. (citations omitted).

Under this standard, Defendants argue that Plaintiff's allegations, even if true, do not suffice to establish a work environment that a reasonable person would find objectively hostile (Document No. 110 at 36), and that Plaintiff does not allege that Defendants physically threatened her or made sexual advances towards her; she alleges she felt degraded. Moreover, Defendants argue that Plaintiff has not alleged the existence of severe and pervasive harassment sufficient to materially alter the terms and conditions of employment that is required to state a viable hostile environment claim. (Document No. 110 at 35).

**1. Continuing Violation Doctrine**

In order for Plaintiff's claims to constitute a "continuing violation," the Court must determine that all of the allegations "are [ ] part of an ongoing series of discriminatory acts...." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). The continuing violation doctrine only applies to hostile work environment claims because such claims are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,....'" Morgan, 536 U.S. 101,117 (quoting 42 U.S.C. § 2000e-5(e)(1)). The Supreme Court has stated that the "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Morgan, 536 U.S. at 120.

In determining whether harassment allegations, which straddle the limitations cut-off date, are part of the same actionable hostile environment claim, this Court considers whether the allegations made by Plaintiff (1) involved the same type of employment actions; (2) occurred relatively frequently; and (3) were perpetrated by the same managers. See Randall v. Potter, 366 F. Supp. 2d 104, 116 (D. Me. 2005) (citing Morgan, 536 U.S. at 120). The continuing violation doctrine does not apply to an employee's claims which span different working environments or where the employee changed worksites and managers prior to the limitations cut-off date. See Id. at 117 (not part of same actionable hostile environment where plaintiff "work[ed] under different supervisors, [on] a different shift, and [with] a different crew"); Little v. NBC, Inc., 210 F. Supp. 2d 330, 368 (S.D.N.Y. 2002) ("[Plaintiff's] allegations involve different co-workers and supervisors, in different time periods and on different shows. These differences preclude invocation of the continuing violation doctrine.").

Applying these principles to the instant action requires an examination of Plaintiff's various jobs, spanning her approximately fifteen-year career with the Gas Company, in order to determine whether Plaintiff's allegations outside of the limitations period are part of the same, i.e., continuing, actionable hostile environment claim. See Morgan, 536 U.S. at 120.

### 2. Facilities Maintenance

As previously set forth, Plaintiff worked in many different capacities and for several different supervisors during her tenure with the Gas Company. From 1989 through 2002, Plaintiff was an employee of the Facilities Maintenance Department. In September 2002, Plaintiff left the Facilities Maintenance Department and began reporting to a different building and spending almost all of her working hours in the field on her leak survey routes. See Document No. 111 at 43-44. The fact that Plaintiff's new position in leak survey included new coworkers, a new supervisor and different working conditions forecloses her attempt to invoke the continuing violation doctrine. Since the applicable claim cutoff date is May 13, 2003, the claims based on events allegedly occurring from 1989 through 2002 are time-barred. They cannot be resurrected by the continuing violation doctrine because plaintiff "work[ed] under different supervisors, [on] a different shift, and [with] a different crew." See Randall, 366 F. Supp. 2d at 117 (finding that such allegations are not part of the same actionable hostile environment) ; see also Little, 210 F. Supp. 2d at 368. In other words, Plaintiff's departure from Facilities Maintenance acted as a breach in continuity.

### 3. Customer Service

Any allegations which occurred during Plaintiff's five and one-half months as a Trainee in Customer Service during 1999 are also not part of a single actionable hostile work

environment. Plaintiff left the Customer Service Department years prior to the May 13, 2003 limitations cut-off date and never again worked under the same supervisor or with the same coworkers. Plaintiff failed to set forth facts that connect her allegations in the Customer Service Department during 1999 with her work experiences within the limitations period. Therefore, her hostile environment claim is also time-barred as to all allegations pertaining to the Customer Service Department.

**4. Meter Reading**

Likewise, to the extent Plaintiff alleges a hostile environment claim based on allegations relating to Plaintiff's two-week period of employment in Meter Reading during 2002, those claims are also time-barred since Plaintiff had a new supervisor, Frank Lisi, new job responsibilities and new work conditions.

**5. Leak Survey**

Finally, Plaintiff alleges that there was a gender-based hostile environment in leak survey while she was there from September 2002 until December 2003 in which "[t]he boss [Cliff Richer] and Merle Dean had a special relationship and the bullying atmosphere was a back and forth…." Document No. 111, ¶ 45. Plaintiff complains about the conduct of three people, Richer (her male supervisor), Dean (her male coworker) and Alderman (a female coworker). Plaintiff does not allege that Richer or Dean physically threatened or touched her or that either of them made sexual advances towards her. This Court examines each of the alleged instances.

Specifically, Plaintiff's allegations of a hostile environment in leak survey consist of the following allegations against Richer: (1) he called her the nicknames – "one-oar" and "blondie," Id. ¶ 46; and (2) he commented that Plaintiff must have been involved in drinking and drugs

because she was brought up in the sixties and seventies. Id. ¶ 49. Plaintiff alleges that she was offended by what was said and that she felt degraded by Richer's use of nicknames. Id. ¶ 39.

Moreover, Plaintiff alleges that her coworker, Dean, contributed to the alleged hostile environment through the following alleged behaviors: (1) Dean commented about the "tits on that one," referring to an actress in a movie he had seen with his wife the previous night; (2) Dean talked with Richer about a story that had been circulated around the Company regarding a man getting dragged around the shower by his penis; (3) Dean would sing alternate lyrics, such as "Oh, I want to fuck my wife today," to "oldies" that were on the radio; (4) and Dean mentioned, while driving with Plaintiff, that a "black woman [had been] raped off the bridge." Id. ¶ 50.

Finally, Plaintiff alleges that, in December 2004, coworker Alderman called her name in the workplace and then showed her a gun.

Defendants argue that the alleged incidents, if true, are not sufficiently "severe or pervasive" to rise to the level of a hostile work environment as a matter of law. This Court is mindful that, "while a plaintiff must show 'more than a few isolated incidents of [discriminatory] enmity,' there is no 'absolute numerical standard' by which to determine whether harassment has created a hostile environment." Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st Cir. 1999) (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2nd Cir. 1986); Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2nd Cir. 1999) ("[T]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.") (citation

omitted). In fact, "even a single episode of harassment, if severe enough, can establish a hostile work environment." Richardson, 180 F.3d at 437 (quoting Torres v. Pisano, 116 F.3d 625, 631 (2nd Cir. 1997)).

Yet, even viewing all of the evidence in a light most favorable to Plaintiff, there is no trialworthy issue on her hostile environment claim related to leak survey. While her allegations portray a work atmosphere that was unpleasant for Plaintiff, they simply do not rise to the level of a hostile work environment. See Rivera-Martinez v. Commonwealth of Puerto Rico, No. 05-2605, 2007 WL 16069, *3 (1st Cir. Jan. 4, 2007) ("Title VII was not intended to be a 'general civility code'; therefore, conduct must be extreme to be actionable."); Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) (Title VII "does not guarantee a utopian workplace, or even a pleasant one....[but] [a]s long as the hostility was not based on a protected characteristic, Title VII is not implicated."); Rigau v. Pfizer Caribbean Corp., 525 F. Supp. 2d 272, 283 (D.P.R. 2007) ("[w]hen followed correctly, [Title VII] 'will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'").

In addition to the fact that her claims, even if credited, are insufficient to create a trialworthy issue, Plaintiff has not properly supported her allegations. Plaintiff submitted an Affidavit in support of her claims, but that Affidavit merely contained a reiteration of the conclusory statements set forth in her Complaint, and thus was insufficient. Rule 56(e), Fed. R. Civ. P., provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "[If] affidavits

submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). Plaintiff's purported Affidavit is insufficient and is not admissible for purposes of this Motion. "Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

Further, Plaintiff's exhibits contain a variety of unauthenticated documents, but only her Affidavit and Deposition are actually admissible evidence. Plaintiff provided few, if any, specifics as to time range, who made certain statements or who certain statements were made to.[6] In Rayl v. Decision One Mortgage Co., No. IP 01-0337-C-K/H, 2003 WL 21989992 at *5 n.5 (S.D. Ind. Aug. 19, 2003), a pro se plaintiff in a Title VII hostile environment case submitted an affidavit which "state[d] in conclusory fashion, '[t]hat [her supervisor] continuously berated, belittled and harassed [plaintiff] during her [employment] tenure....'" Rayl, 2003 WL 21989992 at *5 n.5. In the absence of any "specifics," the Court in Rayl determined that the affidavit was insufficient to avoid summary judgment. Id. Like the plaintiff in Rayl, the Affidavits submitted by Plaintiff are insufficient to avoid summary judgment. Id.

For these reasons, I recommend that Defendants' Motion for Summary Judgment be GRANTED on Plaintiff's gender-based hostile environment claim.

---

[6] Other exhibits, such as copies of emails, are not admissible, as they have not been authenticated by Plaintiff either through deposition testimony or otherwise.

### D. Intentional Infliction of Emotional Distress under Rhode Island Tort Law

Count III of the Amended Complaint asserts a claim for intentional infliction of emotional distress ("IIED"). That claim is barred by the exclusivity provision of the Rhode Island Workers' Compensation Act ("WCA"), R.I. Gen. Laws § 28-29-20. The WCA provides that the right to compensation for a workplace injury is "in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise...." R.I. Gen. Laws § 28-29-20. See also Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 581-582 (D.R.I. 1996) ("the Court concludes that the Rhode Island Workers' Compensation Act provides the sole avenue of redress for employees who have suffered intentional infliction of emotional distress as a result of workplace sexual harassment and other discrimination.")

In Iacampo, this Court noted that in order to avoid summary judgment on an IIED claim, a plaintiff is required to show "either that she is not subject to the WCA or that the emotional distress she suffered was unrelated to the workplace." Id. at 582. Like the plaintiff in Iacampo, Plaintiff has done neither. First, there is a presumption that Plaintiff is subject to the WCA, and it is Plaintiff's burden to rebut that presumption. Plaintiff has not presented evidence to rebut the presumption. Second, the allegations which underlie the IIED occurred in the workplace while Plaintiff was employed by the Gas Company. Therefore, the WCA applies to the IIED claim and its exclusivity provision bars consideration of the claim in this forum.

Plaintiff has not met her burden of showing a trialworthy issue, therefore I recommend that Defendant's Motion for Summary Judgment as to the IIED claim be GRANTED.

**Conclusion**

For the reasons stated, I recommend that the District Court GRANT Defendant's Motion for Summary Judgment (Document No. Document No. 110) as to all claims in Plaintiff's Complaint and enter Final Judgment in favor of Defendant. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72.

Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 21, 2008