# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff, | : | |
| v. | : | C.A. No. 04-434-S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Southern Union Co. and New England Gas Co. move pursuant to Fed. R. Civ. P. 56 for summary judgment with respect to all five counts asserted in the Amended Complaint of Plaintiff Lynore Horn. In support of this Motion, Defendants rely upon the accompanying Local Rule 56(a) Statement of Undisputed Facts with attached exhibits, and Memorandum in Support of Motion for Summary Judgment.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, via Federal Express overnight delivery and certified mail a true and accurate copy of the within document to Lynore Horn, 88 Alger Avenue, East Greenwich, RI 02821 this 30th day of June, 2006.

[signature]

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff, | : | |
| v. | : | C.A. No. 04-434-S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Southern Union Co. and New England Gas Co. (collectively, "Defendants" or "the Gas Company") move for summary judgment with respect to all five counts asserted in the Amended Complaint of Plaintiff Lynore Horn ("Plaintiff" or "Horn"). Plaintiff's five counts assert essentially three separate causes of action under two Rhode Island state antidiscrimination statutes, the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 et seq., and the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1 et seq. Plaintiff's causes of action are (1) hostile work environment claims under both RICRA and FEPA, Counts II and V ; (2) disparate treatment claims under both RICRA and FEPA, Counts I and IV; and (3) and an intentional infliction of emotional distress claim under state tort law, Count III.

Defendants are entitled to summary judgment on all of Plaintiff's counts. Plaintiff's allegations constituting her harassment claims are time-barred as to all allegations predating June 4, 2001, based on the presumptive three year statute of limitations of RICRA.[1] Additionally,

[1] Plaintiff filed her judicial complaint alleging violations of RICRA and a claim of intentional infliction of emotional distress on June 4, 2004. She filed a complaint with the Rhode Island Commission for Human Rights, alleging violations of FEPA, on May 13, 2004. She subsequently amended her judicial complaint to include claims under FEPA, having pursued the requisite administrative process. Defendants have filed a Motion to Certify Question to the Rhode Island Supreme Court on the issue of whether RICRA should be interpreted to have a one-year or three-year statute of limitations. That determination would be dispositive of certain of Plaintiff's

those allegations that are not per se untimely simply do not rise to the level of actionable harassment under the precedents applying state law and analogous federal law to similar claims. Plaintiff's allegations of disparate treatment are equally deficient as a matter of law. Plaintiff has not adduced any evidence that she was the victim of unfair treatment with regard to the terms and conditions of employment on account of her sex. Lastly, Plaintiff's intentional infliction of emotional distress claim is per se unavailable to Plaintiff because her remedy for an alleged work-related personal injury is limited by the exclusivity provision of the Rhode Island Workers' Compensation Act ("WCA"), R.I. Gen. Laws §28-29-20. Moreover, that claim must fail for lack of proof on the essential elements of the claim. For these and other reasons discussed below, Plaintiff's claims should be dismissed in full.

## I. Facts and Travel[2]

Plaintiff is a female who began working for Defendants' predecessor, Providence Gas, in 1989. Defendant's Statement of Undisputed Facts ("Stmt.") ¶10. After holding several positions with the Gas Company between 1989 and 1992, Plaintiff began working within the facilities maintenance department. Stmt. ¶¶ 11-14. Her supervisor was Ed Bolduc. Stmt. ¶¶ 13-14. Between 1992 and May 1999, Plaintiff continued to work within facilities maintenance, doing cleaning and other maintenance work, under Bolduc. Stmt. ¶¶ 14-16. Plaintiff initially worked at the Gas Company's Weybosset St. office building, but spent the majority of the time between 1992 and May 1999 working the night shift in the Gas Company's Dexter St. facility. Stmt. ¶ 15. In 1998, Plaintiff was transferred to the day shift. Stmt. ¶ 16. Although Plaintiff did not file

---

claims. Therefore, for purposes of this Motion, defendants recognize that this Court is bound by the First Circuit's determination that RICRA has a three-year statute of limitations, see infra Section III-A, but also rely on and incorporate by reference their previous argument in the Motion to Certify that the issue should be certified to the Rhode Island Supreme Court.

[2] For the sake of brevity and conciseness, Defendants recount only certain key facts material to the resolution of this case. For a complete recitation of all material undisputed facts, please refer to Defendant's Local Rule 56(a) Statement of Undisputed Facts.

any grievances while in facilities maintenance between 1992 and 1999, she alleges that she was subjected to sexually-charged harassment and physically threatening behavior by her coworkers, and was otherwise frequently criticized and treated unfairly by Bolduc during this period. Stmt. ¶¶ 17-18.

In May 1999, Plaintiff transferred to the Gas Company's customer service department, where she undertook customer service training until October 1999. Her supervisor in customer service was Dave Lauble. Stmt. ¶ 19. Plaintiff then voluntarily transferred back into the facilities maintenance department because of the possibility she would be involuntarily "bumped" into what she perceived to be a less favorable position if she remained in customer service. Stmt. ¶ 20.

Plaintiff returned to facilities maintenance in October 1999, where she worked day shifts at Dexter St. under the supervision of Bolduc until September or October of 2000. Stmt. ¶ 22. During this period, Plaintiff alleges that Bolduc would not speak with her, and that when he did, he would lose his temper. Plaintiff testified that Bolduc did not use vulgar language toward her, but did use "aggressive" and "degrading" language. Asked for examples, Plaintiff cited Bolduc's asking her if she had graduated from high school when he was preparing forms for her to attend boiler operator's courses. Plaintiff also alleges that Bolduc criticized her unfairly and more often than other employees, but does not allege specifics with the exception of a few alleged incidents. Stmt. ¶ 23.

Plaintiff did not have any meaningful problems with her co-workers at Dexter St. in 1999 and 2000. Plaintiff testified that occasionally one co-worker, Ken Schiano, would unintentionally expose his underwear when tucking in his shirt. When Plaintiff told him that she found it inappropriate, Schiano "apologize[d]" and "tr[ied] to stop." Stmt. ¶ 24. Plaintiff also

testified that her co-workers used a lot of vulgar language at Dexter St., but stated that she "would never sue for just that." Stmt. ¶ 25.

In approximately September or October of 2000, Plaintiff was moved to the Weybosset St. building, where she worked with Jerry Porter under the supervision of Bolduc. Stmt. ¶ 26. Porter treated Plaintiff "very good." Stmt. ¶ 27. Plaintiff alleges that an unnamed person or persons at Weybosset St. spoke of the "physical features of a woman," including "women's chests," while Plaintiff was in an elevator. No such comments were directed at Plaintiff. Stmt. ¶ 28. Plaintiff also alleges that two Weybosset St. co-workers were engaged in a romantic relationship, and that she saw the female co-worker jump into the arms of the male co-worker. Plaintiff did not complain to her superiors about this behavior. Stmt. ¶ 29. Plaintiff also took offense to alleged comments made by an unnamed persons or persons that the new female executive vice president of the Gas Company was "stupid" and a "fat slob." Stmt. ¶ 32. Plaintiff's one complaint about Bolduc during the spring of 2001 is that he yelled at her because she was humming and singing while painting. Stmt. ¶ 34.

Gary Sunday – who would replace Bolduc as facilities maintenance supervisor after Bolduc's retirement on June 30, 2001 – arrived in facilities maintenance in May 2001. Stmt. ¶ 31. In late May 2001, at Bolduc's behest, Sunday gave Plaintiff a written reprimand for sloppy work while painting in the garage. Plaintiff believed the reprimand was unjustified, and recalled Sunday's alleged comment (which he denies) that Plaintiff "get on [her] hand and knees and scrub" the spilled paint. Plaintiff testified that in response to this directive, she and a co-worker were "laughing in hysterics." Stmt. ¶ 35. Plaintiff's job duties, pay rate, and work schedule did not change as a result of the late May paint incident. Stmt. ¶ 36.

Plaintiff alleged no incidents involving either Bolduc, Sunday, or anyone else during the month of June 2001. Stmt. ¶ 37. After Bolduc's retirement, Plaintiff's main complaint about Sunday was that he "would not talk to [her]" and "would stop conversations when [she] came into the room." Stmt. ¶ 41. According to Plaintiff, Sunday did not use vulgar or inappropriate language or "degrade" her. Stmt. ¶¶ 38-39. Sunday would sometimes comment on Plaintiff's hair, but Plaintiff readily admitted that Sunday's comments were made out of concern that her hair was properly tied back so as to prevent it from getting caught in machinery. Stmt. ¶ 39. Other than one grievance regarding overtime, Plaintiff had no other complaints about Sunday. Stmt. ¶¶ 40-41.

In September 2002, after a two-week stint in the meter reading department, Plaintiff transferred into the leak survey department.[3] Stmt. ¶¶ 42-43. She alleges that her supervisor, Cliff Richer, and her co-worker, Merle Dean, used vulgar language and discussed crude and inappropriate topics. Stmt. ¶¶ 45, 49-50. Plaintiff complains that Richer called her nicknames that she found offensive. Stmt. ¶ 46. Richer did not know that Plaintiff found the nickname "One-Oar" offensive and stopped using it as soon as his superior, Mike McGuire, alerted him that Plaintiff had lodged a complaint. Stmt. ¶ 47. Richer denies Plaintiff's allegation that he called her "Blondie." Stmt. ¶¶ 46-47. Barbara Alderman, the only other female in leak survey, did not have a nickname. Stmt. ¶ 48.

Plaintiff also asserts that Richer discriminated against her with respect to vehicle assignments and overtime, survey routes, and one three-week training assignment in the construction and maintenance department ("C&M"). Stmt. ¶¶ 51-59. Richer adamantly denies discriminating against Plaintiff on account of her sex, or treating her unfairly in any respect.

[3] Plaintiff's allegations during her time in the leak survey department are briefly summarized here, as they are discussed in far more detail infra at Section III-C.

Plaintiff has adduced no evidence that she was the victim of discrimination with respect to vehicle assignments and overtime, survey routes, or C&M training. Stmt. ¶ 58.

Plaintiff claims that in December 2004, co-worker Barbara Alderman called her name and showed her a gun. Plaintiff does not remember whether Alderman said anything else. She left work that day, and never returned to work at the Gas Company. She was terminated one year later, in December 2005. Plaintiff has filed a separate claim with the Rhode Island Commission for Human Rights alleging that the termination was the result of disability discrimination. Stmt. ¶ 60.

## II. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 43 (1st Cir. 2003). "A fact is 'material' if it has the 'potential to affect the outcome of the suit under the applicable law.'" Randall v. Potter, 366 F. Supp. 2d 104, 112 (D. Me. 2005) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)). An issue is "genuine" only if the evidence relevant to that issue is "sufficiently open ended to permit a rational factfinder to resolve the issue in favor of either side." Id. (quoting National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (subsequent history omitted)). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Rodriguez v. Potter, 419 F. Supp. 2d 58, 63 (D.P.R. 2006). Conclusory assertions and unsupported speculation do "not meet a party's burden of producing some defense to a summary judgment motion." Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995).

## III. Legal Argument

With respect to her discrimination claims, Plaintiff has alleged violations of RICRA and FEPA, state antidiscrimination statutes. When applying these statutes, the Rhode Island Supreme Court routinely looks for guidance from federal courts interpreting Title VII. See Croce v. State, 881 A.2d 75, 79-80 (R.I. 2005) (discussing several First Circuit cases in analysis of continuing violation theory under FEPA and RICRA); DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005); Center for Behavioral Health, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998) (citing Newport Shipyard v. Rhode Island Commission for Human Rights, 484 A.2d 893, 897-98 (R.I. 1984)). Consequently, this Court should look to federal cases addressing harassment and disparate treatment under Title VII in ruling on Defendants' summary judgment motion.

### A. PLAINTIFF'S HOSTILE ENVIRONMENT CLAIMS BASED ON ALLEGATIONS PRIOR TO HER SEPTEMBER 2002 ARRIVAL IN LEAK SURVEY ARE TIME-BARRED OR OTHERWISE NOT VIABLE.

"It is widely recognized that statutes of limitations are 'designed to keep stale claims out of court.'" Croce, 881 A.2d at 79 n.7 (quoting Muniz-Cabrero v. Ruiz, 23 F.3d 607, 611 n.6 (1st Cir. 1994)). In employment discrimination actions, the limitations period "protects the accused by guaranteeing that they receive sufficient notice of the alleged violations to adequately investigate the claims while those claims are still reasonably susceptible to investigation." Place v. California Webbing Indus., Inc., 249 F. Supp. 2d 157, 161 (D.R.I. 2003). Furthermore, the limitations period is "designed to provide [defendants] with adequate time for such matters as scheduling witnesses, hiring lawyers, and gathering and compiling evidence of the alleged violations before witnesses' memories of the incidents become too obscure." Rathbun v. Autozone, Inc., 253 F. Supp. 2d 226, 232 (D.R.I. 2003) (hereinafter "Rathbun I") (subsequent

history omitted) (quoting Ferguson Perforating & Wire Co. v. Rhode Island Comm'n for Human Rights, 415 A.2d 1055, 1056 (R.I. 1980)).

In the instant case, Plaintiff filed her first Complaint, alleging causes of action under RICRA (and a tort claim), on June 4, 2004. Stmt. ¶ 8. RICRA does not contain its own statute of limitations, Rathbun I, 253 F. Supp. 2d at 231, and the Rhode Island Supreme Court has "never had occasion to hold what limitations period is applicable." Croce, 881 A.2d at 79. In Rathbun v. Autozone, Inc., 361 F.3d 62, 66-70 (1st Cir. 2004) (hereinafter "Rathbun II"), the First Circuit, rejecting (in Defendants' opinion) the better-reasoned decision of this Court in Rathbun I, held that Rhode Island's residual statute of limitations for injuries to the person, R.I. Gen Laws § 9-1-14(b), applies to claims under RICRA. Rathbun II, 361 F.3d at 66-70. Thus, for the purposes of this motion, Defendants assume – without conceding – the applicability of a three-year statute of limitations for Plaintiff's discrimination claims. See Croce, 881 A.2d at 79. However, based on the decision in Croce and this Court's reasoning in Rathbun I, Defendants believe that a certification of the question of the RICRA statute of limitations would result in the Supreme Court holding that a one-year statute of limitations applies. If that were the case, Plaintiff's claims would be further constricted by that limitations period.[4]

Thus, Plaintiff's claims based on allegations prior to June 4, 2001, (or, potentially, May 14, 2003, one year prior to the filing of the RICHR charge) are facially time-barred absent some equitable exception. See, e.g., Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 46 (1st Cir. 2005); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 405 (1st Cir. 2002). For example, under the United States Supreme Court's decision in National R.R. Passenger Corp. v.

[4] Specifically, Defendants submit that the arguments upon which they rely in Sections III-A-5 and III-B-1 would apply equally to defeat Plaintiff's (1) hostile environment claims for the period prior to Plaintiff's September 15, 2002 arrival in leak survey, and (2) disparate treatment claims based on discrete acts occurring prior to May 13, 2003.

Morgan, 536 U.S. 101, 116-18 (2002), and its progeny, a plaintiff can recover for a hostile work environment occurring outside the limitations period so long as one act contributing to the claim occurs within the filing period. See id. at 117; see also Crowley, 303 F.3d at 395-96; Randall, 366 F. Supp. 2d at 114-15. Not every hostile work environment amounts to a "continuing violation" for the purposes of bringing otherwise untimely incidents into the limitations period under Morgan. See Randall, 366 F. Supp. 2d at 115. In determining whether harassment within and without the limitations period is part of the same actionable hostile environment claim, courts look to whether the complained-of incidents (1) involved the same type of employment actions; (2) occurred relatively frequently; and (3) were perpetrated by the same managers. See id. at 116 (citing Morgan, 536 U.S. at 120). Thus, "if an act [within the limitations period] had no relation to the acts [comprising a hostile work environment outside the limitations period], or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee can not recover for the previous acts." Morgan, 536 U.S. at 118.

1. PLAINTIFF CANNOT ESTABLISH, THAT A HOSTILE WORK ENVIRONMENT EXISTED IN FACILITIES MAINTENANCE AFTER HER RETURN IN OCTOBER 1999.

Plaintiff has not alleged, and certainly cannot prove, that she was subjected to a hostile work environment upon her return to facilities maintenance in October 1999. In order to establish a hostile work environment, Plaintiff "must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello v. City of Boston, 398 F.3d 76, 93 (1st Cir. 2005) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)). The harassment must be "objectively . . . offensive, one that a reasonable person would find hostile or abusive" Id. (quoting Faragher, 524 U.S. at 787). In determining

whether a reasonable person would find particular conduct hostile or abusive, a court must examine the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Faragher, 524 U.S.at 787-88). "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Id.

Plaintiff's allegations of a hostile environment in facilities maintenance from October 1999 until September 2002, when she left the department, are based almost entirely on the alleged actions of her initial supervisor there, Ed Bolduc. Gary Sunday arrived in the department in May 2001, and after Bolduc retired on June 30, 2001, Sunday became Plaintiff's sole supervisor. As discussed infra, Plaintiff does not come close to alleging an actionable hostile work environment during Sunday's tenure. Bolduc's retirement coupled with Sunday's hiring as his replacement is exactly the type of "intervening action by the employer" contemplated in Morgan, 536 U.S. at 118, that requires analyzing the two periods separately for the purpose of determining whether a hostile work environment existed under either supervisor. With these principles in mind, Defendants address Plaintiff's allegations in facilities maintenance between October 1999 and September 2002 in reverse chronological order.

a. Plaintiff Does Not Allege Any Facts to Establish a Hostile Environment Under Gary Sunday's Supervision from July 1, 2001 to August 31, 2002.

Plaintiff has not alleged that she was harassed or otherwise subjected to a hostile work environment while she was under the supervision of Gary Sunday from July 1, 2001 to August 31, 2002. Plaintiff had no problems with her only co-worker during this time, Jerry Porter. Plaintiff testified that Sunday did not use offensive or vulgar language or "degrade" her. Stmt. ¶

38-39. When asked if Sunday ever used language that had sexual connotation or commented on the appearance of women, Plaintiff referred to Sunday's alleged statement that "would not be seen with me out in public because if his wife ever saw me, he said that he would be divorced. I was not to be seen with him at all." She also cited Sunday's "comments on [her] hair," but went on to explain that Sunday "wanted it tied so tightly that not one little piece would fly. He seemed to be nervous about a woman having hair around machinery." Sunday's testimony corroborated Plaintiff's understanding of the "hair" comments, and Plaintiff cited no other instances. Stmt. ¶ 39. Plaintiff filed one grievance during Sunday's tenure, complaining that Sunday had fixed a leaky urinal himself when he should have called Plaintiff in for overtime to complete the task. (Sunday testified that he called Plaintiff but could not reach her.) The grievance was resolved through normal channels, and Plaintiff was compensated. Stmt. ¶ 40.

Plaintiff's primary complaint with Sunday was that he "would not talk to me. . . . [H]e would stop conversations when I came into the room." Stmt. ¶ 41. Although Plaintiff's allegation that Sunday "would not talk to" her is plainly contradicted by her testimony that he did in fact talk to her about, inter alia, workplace safety, this discrepancy is immaterial. Mere ostracism is not sufficient to establish a hostile work environment. Noviello, 398 F.3d at 92; (1st Cir. 2005) ("rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim"); Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir. 2002); Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment where Plaintiff's supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work"). Plaintiff's allegations during Sunday's tenure are completely insufficient to establish "severe or pervasive harassment that materially altered the conditions of her employment." Faragher, 524 U.S. at

786; see also Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 693 (8th Cir. 1997) (holding that disrespect and ostracism did not rise to the level of actionable adverse employment action because there was no tangible change in duties or working conditions); Paquin v. MBNA Marketing Sys., Inc., 233 F. Supp. 2d 58, 64 (D. Me. 2002) (although perhaps creating an unpleasant working environment, five instances of inappropriate conduct falls "well short of the frequency required to amount to an abusive working environment").

b. Plaintiff's Allegations Against Ed Bolduc from October 1999 to His Retirement in June 2001 Do Not Establish a Hostile Work Environment.

Because Plaintiff does not allege an actionable hostile work environment while working under supervisor Gary Sunday, her hostile work environment claim must be grounded in her allegations against supervisor Ed Bolduc, who retired on June 30, 2001. Plaintiff alleges that Bolduc (1) would not talk to her; (2) would lose his temper with her "immediately"; (3) used aggressive and degrading language, e.g., yelling at the top of his lungs "Did you go to high school?" and criticizing Plaintiff unfairly and more than other supervisees; (4) yelled at her for singing while she was painting; (5) was the driving force behind Gary Sunday's written reprimand regarding the May 26, 2001 spilled paint incident; and (6) disfavored Plaintiff in the distribution of overtime. Stmt. ¶¶ 23, 30, 35. Importantly, Plaintiff does not allege that Bolduc ever (1) used vulgar or sexually offensive language; (2) physically threatened or touched her; or (3) made sexual advances towards her.

Even if Plaintiff's unsupported, self-serving allegations are taken as true, she has simply failed to allege an actionable hostile work environment. First, Plaintiff cannot establish that the complained-of behavior was so "severe or pervasive" that it "materially altered the conditions of her employment." Faragher, 524 U.S. at 786; Paquin, 233 F. Supp. 2d at 64 (even where conduct was explicitly sexual, five incidents insufficient to support hostile environment claim). With

respect to Plaintiff's allegations that Bolduc would not communicate with her, would lose his temper, would yell at her, and would criticize her, it is well established that employment antidiscrimination laws "do[] not guarantee a utopian workplace, or even a pleasant one," Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994), and are not a "general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." See Noviello, 398 F.3d at 92 (1st Cir. 2005). Plaintiff cannot establish a hostile environment even if Bolduc was "rude, abrupt, and . . . failed to keep [Plaintiff] informed about changes at work." Patton, 276 F.3d at 339; see McKenzie v. Milwaukee County, 381 F.3d 619, 624-625 (7th Cir. 2004) (no hostile work environment where supervisor was "unfriendly" and "unapproachable").

Further, and more importantly, Plaintiff does not allege – except in the most conclusory manner – and otherwise cannot show that Bolduc's complained-of conduct amounted to discrimination "because of sex." Cardona v. Aramark Servs., 9 F. Supp. 2d 92, 99 (D.P.R. 1998) (citing Oncale, 523 U.S. at 79). "The law does not prohibit all physical or verbal harassment in the workplace; rather, it prohibits harassment which is motivated by sex-based discrimination." Id. Plaintiff has presented no evidence to show that Bolduc's treatment of her, even if hostile, was based on her gender. Patton, 276 F.3d at 339. This is fatal to her claim. Id. None of Bolduc's alleged statements directed toward Plaintiff concerned, or even alluded to, her gender. Cf. Dykstra v. First Student, Inc., 324 F. Supp. 2d 54, 67-68 (D. Me. 2004) (no hostile work environment where the only statement that arguably humiliated plaintiff "did not even concern her sex"). With respect to Plaintiff's two grievances regarding overtime during this period,

nothing in those grievances, or the manner in which they were resolved, support any inference of sex discrimination.

At best, Plaintiff can show that Bolduc's alleged hostility toward her was "purely personal." See Patton, 276 F.3d at 339. Yet, it is well settled that incidents showing that a supervisor disliked an employee and was rude or unfair to her do not, without more, prove a claim of hostile work environment. Thomas v. New York City Health & Hosps. Corp., 2004 U.S. Dist. LEXIS 17694, at *51 (S.D.N.Y. Sept. 2, 2004). As long as the hostility was not based on a protected characteristic, Rhode Island's antidiscrimination statutes are not implicated. See Patton, 276 F.3d at 339. As Plaintiff has adduced no evidence that Bolduc's alleged conduct was based on her sex, she cannot establish a hostile work environment while under his supervision from October 1999 through June 2001.[5]

2. PLAINTIFF'S PRE-MAY 1999 HOSTILE ENVIRONMENT CLAIM IS TIME-BARRED BECAUSE IT IS INDEPENDENT AND UNRELATED TO LATER ALLEGATIONS AND THUS IS NOT PART OF THE "SAME HOSTILE ENVIRONMENT CLAIM" UNDER MORGAN.

Plaintiff alleges that she was harassed and subjected to a hostile work environment while in facilities maintenance (or its predecessor department) from 1989 to May 1999. Stmt. ¶ 17. Plaintiff has adduced no supporting evidence other than her own conclusory, self-serving, and indescribably vague assertions. Even assuming, arguendo, that Plaintiff could show through competent evidence that she was subjected to a hostile work environment during this period, there is no dispute that this particular hostile work environment ceased when Plaintiff transferred into the customer service department in May 1999. Stmt. ¶¶ 19-20.

[5] Plaintiff's other allegations from this time period, see Stmt. ¶¶ 23-25, 28-29, 32-35, consist of "ordinary, if occasionally offensive, vicissitudes of the workplace" that cannot possibly be construed as creating or otherwise supporting a hostile environment, and thus do not alter the analysis. See Noviello, 398 F.3d at 93.

Under Morgan, "if an act [falling within the statutory filing period] had no relation to the acts [comprising a hostile work environment outside the filing period], or for some other reason, such as certain intervening action by the employer, [it] was no longer part of the same hostile environment claim, then the employee can not recover for the previous acts." Costanzo v. United States Postal Serv., 2003 WL 1701998, at *11 (S.D.N.Y. March 31, 2003) (quoting Morgan, 536 U.S. at 118). This reasoning applies precisely to the instant case. The Gas Company posted a job opening in the customer service department. Plaintiff opted for the transfer, which the Gas Company arranged. Plaintiff had a different supervisor, different co-workers, and different job responsibilities. As Plaintiff put it: "New boss. New field." Stmt. ¶ 19. There is no question that whatever alleged hostile environment existed in facilities maintenance prior to May 1999, it evaporated upon Plaintiff's departure to a brand new employment situation.

In similar circumstances, the court in Costanzo v. United States Postal Service held that the plaintiff's hostile work environment claim was time-barred because her timely allegations of harassment were not related to her untimely allegations. 2003 WL 1701998, at *11. The court stated that "whatever 'abuse' plaintiff received during her [previous] assignment . . . plaintiff's working circumstances clearly changed after her transfer to a new team with a new direct supervisor . . . ." Id.; see also Little v. NBC, 210 F. Supp. 2d 330, 368 (S.D.N.Y. 2002) ("[Plaintiff's] allegations involve different co-workers and supervisors, in different time periods and on different shows. These differences preclude invocation of the continuing violation doctrine."); Hill v. Taconic Dev. Disabilities Svcs. Office, 181 F. Supp. 2d 303, 318 (S.D.N.Y. 2002) (holding that allegations of discrimination occurring while employee worked at one work

site were not tied to discrimination that occurred two years later at another site, under different supervisors and with different co-workers).

Nor can the fact of Plaintiff's October 1999 return to facilities maintenance, again under the supervision of Ed Bolduc, revive her pre-May 1999 hostile environment claims under Morgan. Plaintiff simply cannot establish that her pre-May 1999 hostile environment claim is the same as her October 1999 to September 2002 claim, because her allegations from 1992 to May 1999 – the bulk of which allegedly occurred while Plaintiff was on the Dexter St. night shift between 1992 and 1998 – are factually and contextually far removed from her allegations between October 1999 and September 2002, when she primarily worked the day shift at the Weybosset St. office building. From 1989 to 1998, Plaintiff's claims stemmed primarily from co-workers' sexually-charged harassment and physically threatening behavior directed at Plaintiff. After her return, from October 1999 to September 2002, Plaintiff has not alleged sexually-charged harassment or threatening behavior on the part of her co-workers.

Moreover, and as discussed supra, Plaintiff cannot establish that the post-October 1999 period in facilities maintenance amounted to a hostile work environment. As this post-October 1999 period (1) was not a hostile environment; (2) was, at a minimum, six months removed from any previous period of alleged harassment; (3) came on the heels of Plaintiff's six month hiatus in a completely different department with different co-workers and a different supervisor, it cannot be deemed part and parcel of any alleged hostile environment created in the pre-May 1999 period. See Konstantopolous v. Westvaco Corp., 112 F.3d 710, 715-16 (3d Cir. 1997) (seven months between two employment time periods precluded plaintiff from claiming a continuing violation covering alleged acts before the seven month interruption); cf. Costanzo, 2003 WL 1701998, at *11 (rejecting revivification of previous hostile environment where

plaintiff returned to work under same supervisor, but supervisor did not recreate hostile environment).

Furthermore, it is undisputed that Plaintiff voluntarily chose to return to facilities maintenance under Bolduc's supervision after spending five to six months in customer service. Stmt. ¶¶ 19-20, 22. This fact is significant for either of two mutually exclusive reasons. On the one hand, Plaintiff's voluntary return to facilities maintenance shows definitively that Plaintiff believed that whatever hostile environment existed there previously had dissipated. See Konstantopolous, 112 F.3d at 715-16 ("[T]he district court found that the effects of the harassment . . . through August 1989 had dissipated by the time that [plaintiff] returned to work in April 1990; that, therefore, without any new incidents of harassment, there would be no basis for concluding that the working environment in April 1990 was hostile or abusive; and that the few incidents that occurred when [plaintiff] returned were not sufficiently numerous or severe to warrant the conclusion that the working environment remained hostile or abusive."); Bishop v. National R.R. Passenger Corp., 66 F. Supp. 2d 650, 661 (E.D. Pa. 1999) ("Because the break allowed the effects of the earlier acts to dissipate, those acts should not have been considered part of a pattern continued after the break."); cf. Lukaçinsky v. Panasonic Serv. Co., 2004 U.S. Dist. LEXIS 25846, at *69-71 (D. Mass. Nov. 29, 2004) (hostile environment dissipated over six month period between last harassing act and unlawful termination so as to render hostile environment claim time-barred). If, on the other hand, Plaintiff did not believe the hostile environment had dissipated – yet voluntarily returned to facilities maintenance anyway – then she clearly failed to exercise reasonable care to avoid harm. Whitley v. AMTRAK, 2004 U.S. Dist. LEXIS 29682, at *30-31 (D.D.C. June 9, 2004)(court granted summary judgment on hostile environment claim for period when "she placed herself back into a position in which she would

have contact" with an offending supervisor about whom she had previously complained) (citing Faragher, 524 U.S. at 778). Plaintiff always retained the option of remaining in customer service. Stmt. ¶¶ 20-22. Plaintiff should not be allowed to benefit (by bringing in otherwise untimely claims) based on her voluntary return to what she believed was a hostile environment.

Plaintiff simply cannot show that the hostile environment she alleges existed in facilities maintenance pre-May 1999 continued through (a) her six month stay in customer service; (b) her voluntary return to facilities maintenance; and (c) a three year period in facilities maintenance that simply was not a hostile environment. Plaintiff's claims based on the pre-May 1999 period in facilities maintenance were therefore extinguished three years after she transferred to the customer service department, i.e., in May 2002. Because Plaintiff did not file her Complaint alleging RICRA-based counts until June 2004, Defendants are entitled to summary judgment with respect to all claims from the 1989-1999 period.

3. EVEN IF THE ALLEGED HOSTILE WORK ENVIRONMENT IN FACILITIES MAINTENANCE EXTENDED THROUGH PLAINTIFF'S OCTOBER 1999 RETURN TO THE DEPARTMENT, HER CLAIM IS STILL TIME-BARRED.

Even if Plaintiff could show that her allegations in facilities maintenance both before and after her six months in customer service amounted to one actionable hostile work environment, her pre-limitation claim is still time-barred. The law unequivocally requires Plaintiff to show that at least one act contributing to the claim occurred within the filing period. See Morgan, 536 U.S. at 117; Crowley, 303 F.3d at 395-96; Randall, 366 F. Supp. 2d at 114-15. As discussed supra, Plaintiff does not truly allege, and certainly cannot establish, that a hostile environment continued, or existed independently, while Gary Sunday was her sole supervisor. Thus, whether any act contributing to Plaintiff's hostile environment claim occurred within the limitations

period can be determined by looking at the period when Ed Bolduc was still her supervisor, i.e., through June 30, 2001.

Because Plaintiff's RICRA-based Complaint was filed on June 4, 2004, and RICRA presumptively has a three year limitations period, the cut-off date for Plaintiff's claims is June 4, 2001. There is no record evidence that Bolduc or anyone else engaged in any "act" contributing to Plaintiff's hostile environment claim during the month of June 2001. This is fatal to Plaintiff's claim that she was subjected to a hostile work environment while under Bolduc's supervision. Without competent evidence of any such "act," Plaintiff simply cannot, under Morgan, bring her pre-limitations allegations within the purview of the litigable issues in this case. See 536 U.S. at 117. Although Plaintiff has offered conclusory and vague allegations of Bolduc's "degrading" language during his tenure, it is well established that such unsupported and unspecific allegations are insufficient to withstand summary judgment. See Mahgoub v. Miami Dade Cmty. College, 2006 U.S. App. LEXIS 9291 (11th Cir. 2006) (plaintiff cannot avoid summary judgment on timeliness grounds by simply asserting in conclusory fashion that harassing conduct occurred within the limitations period); Lucas v. Chicago Transit Auth., 367 F.3d 714, 726 (7th Cir. 2004) ("We repeatedly have held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment . . . . Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted."); Koss v. Sullivan County, 2002 U.S. Dist. LEXIS 13294, at *8 (S.D.N.Y. July 22, 2002) ("To claim in conclusory fashion that a supervisor engaged in offensive speech without remotely particularizing what he said cannot support a claim of hostile work environment claim."). Because Plaintiff cannot show that an act contributing to the alleged

hostile work environment occurred on or after June 4, 2001, her hostile environment claim based on her time in facilities maintenance must fail.

4. PLAINTIFF'S ALLEGATION OF A HOSTILE WORK ENVIRONMENT WITHIN CUSTOMER SERVICE BETWEEN MAY AND OCTOBER 1999, EVEN IF TRUE, CONSTITUTES A SEPARATE ACTIONABLE CLAIM FROM HER EARLIER AND LATER CLAIMS AND IS THEREFORE TIME-BARRED.

Although the exact contours of Plaintiff's allegations from her roughly six-month period in the customer service department are unclear, there is no dispute that Plaintiff voluntarily left that department in October 1999. Stmt. ¶¶ 20, 22. She never again worked under her customer service supervisor, Dave Lauble, or alongside any of her customer service co-workers. Stmt. ¶ 21. Plaintiff's later allegations are completely separate, independent, and unrelated to those she has lodged with respect to her time in customer service between May and October 1999. After October 1999, Plaintiff had a different boss, different co-workers, and different job responsibilities once again. See, e.g., Randall, 366 F. Supp. 2d at 117 (not part of same actionable hostile environment where plaintiff "work[ed] under different supervisors, [on] a different shift, and [with] a different crew"); Fleming v. Verizon New York, Inc., 2005 WL 1492395, at *7 (S.D.N.Y. June 24, 2005) (transfer from one work location to another "demarcates two separate continuing violations . . . because she worked in two different locations under two different supervisors); Costanzo, 2003 WL 1701998, at *11. There is no dispute that Plaintiff's complaints with respect to her time in customer service, even if true, are not "part of the same actionable hostile environment claim" as her later allegations. Morgan, 536 U.S. at 121.

Plaintiff's claims from May to October 1999 while in customer service were therefore extinguished three years after she transferred out of the customer service department, i.e., in

October 2002. Because Plaintiff did not file her Complaint alleging RICRA-based counts until June 2004, Defendants are entitled to summary judgment with respect to all claims from May to October 1999 while Plaintiff was employed in customer service.

5. PLAINTIFF'S HOSTILE ENVIRONMENT ALLEGATIONS WHILE IN LEAK SURVEY FROM SEPTEMBER 2002 FORWARD DO NOT REVIVE PLAINTIFF'S PRE-LIMITATION HOSTILE ENVIRONMENT CLAIMS.

Plaintiff's hostile environment claims post-dating her transfer to leak survey in September 2002, for the same reasons discussed supra, constitute a separate and independent claim from prior claims based on alleged events in facilities maintenance and customer service. It is undisputed that upon arriving in leak survey, Plaintiff had a new supervisor, new co-workers, a new work location (i.e., "field work," as opposed to remaining within one of the Gas Company's facilities), and, therefore, contextually and factually different allegations. Compare Stmt. ¶¶ 19-41 with ¶¶ 43-60. Such a change in circumstances has uniformly been cause for courts to deem earlier, pre-limitations claims from different settings, under different supervisors, time-barred. See, e.g., Randall, 366 F. Supp. 2d at 117; Fleming v. Verizon New York, Inc., 2005 WL 1492395, at *7; Costanzo, 2003 WL 1701998, at *11. The same result is required here, and Defendants remain entitled to summary judgment on Plaintiff's pre-limitations hostile environment claims.

B. PLAINTIFF'S DISPARATE TREATMENT CLAIMS BASED ON ALLEGATIONS PRIOR TO HER SEPTEMBER 2002 ARRIVAL IN LEAK SURVEY ARE TIME-BARRED OR OTHERWISE NOT VIABLE.

Beyond her hostile environment claims for the period between 1989 and September 15, 2002, Plaintiff alleges that she was subjected to disparate treatment because of her sex by her supervisors. For the reasons discussed below, Plaintiff's claims based on discrete acts prior to June 4, 2001, are time-barred. Furthermore, Plaintiff's one verifiable allegation of disparate

treatment during the period between June 4, 2001 and her arrival in leak survey on September 15, 2002, is insufficient to withstand summary judgment.

### 1. PLAINTIFF'S DISPARATE TREATMENT CLAIMS PRIOR TO JUNE 4, 2001 ARE TIME-BARRED.[6]

In Morgan, the United States Supreme Court reaffirmed the notion that a discrete discriminatory act "occurred" on the day it "happened." 536 U.S. at 110. If a party does not file suit (or a proper administrative charge) within the limitations period following the act, that party "lose[s] the ability to recover for it." Id.

It is entirely unclear what "adverse employment actions" Plaintiff is referring to in her disparate treatment counts. At no time during her entire tenure at the Gas Company was Plaintiff ever demoted or unfavorably transferred. As noted, Plaintiff's termination occurred in 2005 (after Plaintiff was on a leave of absence for one year and failed to return to work) and is not at issue in the instant litigation. Thus, the only allegedly discriminatory discrete acts that Plaintiff has identified prior to June 4, 2001 are two instances in which Plaintiff filed grievances because she believed that she was denied overtime to which she was entitled. Stmt. ¶ 30; see Morgan, 536 U.S. at 112 (quoting Bazemore v. Friday, 478 U.S. 385, 395 (1986)) ("[E]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII . . . ."); see also Kaplan v. City of Chicago, 2004 U.S. Dist. LEXIS 22339, at *21 (N.D. Ill. Nov. 2, 2004) (finding two denials of overtime constituted discrete acts); Shaw v. Potter, 2002 U.S. Dist. LEXIS 21057, at *10 (S.D. Ind. Oct. 24, 2002) ("Each denial of overtime constitutes a discrete discriminatory act . . . .").

---

[6] As indicated above, defendants reserve the right to argue that disparate treatment claims occurring before May 13, 2003 are barred depending on the resolution of the RICRA limitations issue.

There is no dispute that both instances where Plaintiff believed she was denied overtime to which she was entitled occurred prior to May 7, 2001. Stmt. ¶ 30. Because the limitations cut-off is June 4, 2001, Plaintiff cannot recover for those acts even if she can prove they were discriminatory. The same analysis applies to any other discrete, discriminatory adverse employment actions that Plaintiff alleges occurred before June 4, 2001. Defendants are entitled to summary judgment on all such time-barred claims.

2. PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISPARATE TREATMENT WITH RESPECT TO HER SINGLE TIMELY ALLEGATION BETWEEN JUNE 4, 2001 AND SEPTEMBER 15, 2002.

Plaintiff can timely allege disparate treatment during the period following June 4, 2001. With regard to the time period between June 4, 2001 and the date Plaintiff began working in leak survey, September 15, 2002, Plaintiff has alleged only one discrete act of alleged disparate treatment. That alleged discrete act, which resulted in a July 17, 2002 grievance, was Gary Sunday's failure to call Plaintiff in to perform overtime work. Stmt. ¶ 40; see Kaplan, 2004 U.S. Dist. LEXIS 22339, at *21; Shaw, 2002 U.S. Dist. LEXIS 21057, at *10.

In order to establish a prima facie case of disparate treatment under RICRA, Plaintiff must show that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) circumstances exist that give rise to an inference of discrimination, e.g., that she was treated differently from other similarly situated male employees. See DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005); Newport Shipyard v. Rhode Island Comm'n for Human Rights, 484 A.2d 893, 898 (R.I. 1984). Plaintiff simply cannot establish the fourth element of her prima facie case.

The record evidence underlying that event unequivocally indicates that (a) a urinal at the Gas Company was leaking and causing flooding; (b) Sunday did call Plaintiff, but was unable to

reach her; and (c) Sunday proceeded to fix the urinal and clean up afterwards. The evidence also indicates that Plaintiff's grievance was resolved, and Plaintiff was paid for four hours time. Stmt. ¶ 40. Plaintiff has adduced no evidence that Sunday – contrary to his sworn testimony – did not, in fact, call Plaintiff. Even if the Court assumes, for the purpose of summary judgment, that Sunday did not call Plaintiff, Plaintiff simply had not presented any evidence, other than broad, conclusory assertions, that did so "because of [her] sex." Cardona v. Aramark Servs., 9 F. Supp. 2d 92, 99 (D.P.R. 1998) (citing Oncale, 523 U.S. at 79). In any event, Sunday testified that he did the work because he wanted to prevent flooding damage and the danger that someone would slip. Stmt. ¶ 40. Even if Plaintiff could establish a prima facie case of disparate treatment with respect to this incident, Sunday's explanation undoubtedly constituted a legitimate, nondiscriminatory reason for his actions. Plaintiff, needless to say, has procured no evidence of pretext. Defendants are entitled to summary judgment for events underlying the July 17, 2002 grievance.

C. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS ARISING FROM HER TIME IN LEAK SURVEY AFTER SEPTEMBER 15, 2002.

Plaintiff transferred to the leak survey department under the supervision of Cliff Richer on or about September 15, 2002. In leak survey, Plaintiff and her co-workers were responsible for responding to and monitoring suspected or reported gas leaks throughout Rhode Island. Stmt. ¶ 43. Plaintiff transferred to leak survey at approximately the same time as several other employees who were new to the department, including Barbara Alderman, Jim Dawley, and John Langford. Other employees already in the department included Merle Dean, Donald Clement, and Elliot Kemp. Stmt. ¶ 44.

Plaintiff alleges that while in leak survey, she was the victim of gender-based disparate treatment with respect to (a) the assignment of vehicles (which she alleges, in turn, affected the amount of overtime work she received); (b) the assignment of survey routes, and (c) the requirement that she spend three weeks training in the construction and maintenance department (C&M). Stmt. ¶¶ 51-54. Plaintiff also alleges, beyond these allegations, that Richer and Dean created a hostile and abusive work environment. Stmt. ¶¶ 45-50. Because Plaintiff cannot establish either disparate treatment or a hostile environment, Defendants are entitled to summary judgment all of Plaintiff's leak survey-based claims.

1. PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISPARATE TREATMENT WITH RESPECT TO ANY OF HER CLAIMS WHILE IN LEAK SURVEY.

Plaintiff alleges gender-based disparate treatment with respect to (a) Richer's assignment of survey vehicles and, hence, overtime; (b) Richer's assignment of survey routes; and (c) the requirement that Plaintiff spend three weeks training in C&M. Stmt. ¶¶ 45-50. The familiar burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is applicable to Plaintiff's disparate treatment claims under FEPA and RICRA. DeCamp, 875 A.2d at 21. Using this framework, Defendants address each claim seriatim.

a. Plaintiff Cannot Establish a Prima Facie Case of Disparate Treatment with Respect to the Assignment of Vehicles or Overtime.

At the time of Plaintiff's arrival in leak survey, the department had four of its own trucks, three of which were already assigned to Dean, Clement, and Kemp. Because leak survey had more leak surveyors than vehicles, leak survey would periodically borrow vehicles from other departments, on a temporary basis, so that each employee would have a vehicle. Many of the vehicles borrowed by leak survey were older and at times lacked heat and/or air conditioning. Stmt. ¶ 54. Richer assigned all available vehicles on an ad hoc, as needed basis. Stmt. ¶ 53.

James Dawley and Ken Strobel, who arrived in leak survey at roughly the same time as Plaintiff, used the same trucks that they had used in their previous department, customer service. Plaintiff and John Langford were given access to other trucks from other departments, and Plaintiff took a truck that was available from the meter reading department. Stmt. ¶ 55. When Dawley's customer service truck was requisitioned, however, he was assigned the fourth leak survey vehicle. Stmt. ¶ 56.

Plaintiff took exception to the fact that Dawley received the fourth leak survey truck even though she had more seniority within the Gas Company than he did. Plaintiff testified that she "assumed" vehicle assignments were done on the basis of seniority based on "previous knowledge in other departments." Stmt. ¶ 53. When Plaintiff asked Richer why Dawley was assigned the truck, and she was not, Richer told her that he assigned the fourth survey truck to Dawley because Dawley had customer service knowledge that Plaintiff did not. Dawley had worked in the customer service department for approximately five years, as compared to Plaintiff's five-and-a-half month experience in customer service. Stmt. ¶ 56.

Plaintiff alleges, without evidence, that truck assignments determined the amount of overtime for which one was eligible. Plaintiff alleges that without one of the four trucks belonging to leak survey – which were outfitted for so-called "driving survey"[7] – "[y]ou cannot get overtime for a lot of jobs . . . ." Yet, the evidence shows that in 2004, Plaintiff worked virtually the exact amount of overtime hours as Donald Clement, who drove a survey vehicle. Stmt. ¶ 59.

[7] Leak survey is conducted by either walking survey, i.e., the leak surveyor gets out of the survey vehicle and monitors leaks while walking and using a hand-held monitoring device, or driving survey, i.e., the leak surveyor drives very slowly through the survey area using a leak monitoring device that is attached to the survey vehicle. Newcomers to leak survey, like Dawley, Alderman, and Plaintiff, were generally assigned walking survey, and driving survey was generally given to the more experienced employees within the department. Plaintiff was not assigned more walking surveys than the other employees who came into the department at approximately the same time, including Dawley and Alderman. Stmt. ¶ 57.

In conjunction with her complaints about the truck assigned to her, Plaintiff generally alleges, again without evidence, that Richer denied her overtime in leak survey because of her gender. The uncontroverted evidence shows, however, that in determining who would be assigned overtime work, Cliff Richer generally followed the overtime list, which was generally updated on a weekly basis and set forth the number of hours each Leak Survey employee had worked year-to-date. It also stated whether the employee was on leave or on "light duty" and therefore should not be called for overtime. Richer would call the "low overtime" person, i.e., the person who had logged the least overtime hours year-to-date and was not listed as "do not call," as required by the collective bargaining agreement. Due to the nature of gas leaks and similar emergencies, Richer would, if necessary, call the person in the field closest to the site or, alternatively, a person with certain experience necessary to deal with the situation at hand. Plaintiff possesses no evidence that Richer discriminated against Plaintiff, or women in general, in the assignment of overtime work. Stmt. ¶ 58.

Plaintiff simply cannot overcome the monumental challenge of turning these undisputed facts into a viable disparate treatment claim. In order to do so, she must establish a prima facie case, which consists of showing (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) circumstances giving rise to an inference of discrimination, e.g., that she was treated differently from other similarly situated male employees. See DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005); Newport Shipyard v. Rhode Island Comm'n for Human Rights, 484 A.2d 893, 898 (R.I. 1984). Plaintiff cannot satisfy the third or fourth prong of her prima facie case.

Plaintiff cannot satisfy the third element because the assignment of a disfavored vehicle is not an adverse employment action. See Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir.

2002) ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act . . . does not elevate that act . . . to the level of a materially adverse employment action."); Virostek v. Liberty Twp. Police Department/Trustees, 14 Fed. Appx. 493, 504 (6th Cir. 2001) (assignment of an older police vehicle was not an adverse employment action); Rosales v. TXI Operations, LP, 2005 U.S. Dist. LEXIS 3977 (N.D. Tex. 2005) ("The Fifth Circuit has consistently and unambiguously rejected attempts to expand the definition of "adverse employment action" to include claims regarding working conditions, such as the alleged acts of [defendant] regarding [plaintiffs'] vehicles and work assignments.").

Assuming that Plaintiff could satisfy the third element of her prima facie case, Plaintiff has adduced no evidence that Richer discriminated against Plaintiff in the assignment of vehicles, or overtime, on account of her gender. Cardona, 9 F. Supp. 2d at 99 (citing Oncale, 523 U.S. at 79). It is undisputed that there was no policy within leak survey of assigning vehicles by seniority. Stmt. ¶ 53. The evidence clearly shows that every employee who arrived in leak survey around the time that Plaintiff did initially have to use a truck from outside of the department. Stmt. ¶ 55. Richer assigned Dawley the fourth survey truck only when Dawley's customer service vehicle was requisitioned by that department. Stmt. ¶ 56. Although Plaintiff took issue with Richer's explanation that she lacked the customer service experience of Dawley, her disagreement with her supervisor's reasoning is not enough to defeat summary judgment. See Bishop, 299 F.3d at 59; Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("[C]ourts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process.").

Plaintiff also has adduced no evidence, but only the barest of conclusory allegations, that Richer discriminated against her on the basis of her sex in the apportionment of overtime work.

Although denial of overtime is an "adverse employment action," see Kaplan, 2004 U.S. Dist. LEXIS 22339, at *21, there is simply no evidence (a) that Richer failed generally to adhere to the "low-overtime" list absent legitimate exceptions, or, if he did so fail, (b) that he specifically denied Plaintiff overtime opportunities on account of her gender. See Joens v. John Morrell & Co., 243 F. Supp. 2d 920, 949 (N.D. Iowa 2003) ("[Plaintiff] has designated no evidence beyond her very weak prima facie case of a[n overtime] disparity with a similarly situated male that suggests that her sex was the "real reason" for the disparity."). In fact, for the year 2004, Plaintiff worked a virtually identical number of overtime hours as Donald Clement, who drove a "coveted" survey truck. Stmt. ¶ 59. In short, Plaintiff's claims of disparate treatment with respect to vehicle and overtime assignments are without merit, and Defendants are entitled to summary judgment.

b. Plaintiff Cannot Establish a Prima Facie Case of Disparate Treatment with Respect to Her Assignment to a Three Week Training Period in C&M.

Plaintiff's second conceivable disparate treatment claim is easily disposed of. The gist of Plaintiff's allegation is that she was assigned to work in the construction and maintenance department ("C&M") when other employees new to leak survey were not.

From approximately November through March of each year, leak survey employees may be temporarily assigned to C&M as laborers, as needed. For this reason, leak survey employees without C&M work experience are required to undergo training within that department. Plaintiff had no C&M experience, and Alderman had not successfully completed previous C&M training. Therefore, both Plaintiff and Alderman were assigned to C&M training after arriving in leak survey. Jim Dawley and John Langford were not required to spend three weeks in C&M because they had previously worked in that department. Stmt ¶ 51. Plaintiff alleges that this amounts to actionable disparate treatment on account of gender.

As an initial matter, Plaintiff cannot establish a prima facie case, because she cannot show that her temporary assignment to C&M training was an adverse employment action under the applicable precedents. Plaintiff was assigned to C&M training for a mere three weeks. More importantly, it was part of the very job posting that prompted Plaintiff to transfer to leak survey. Stmt. ¶ 51 (citing Dawley Dep. at 22:11) ("It was part of the [job] posting."). Courts have consistently held that "[t]emporary inconvenience to the plaintiff is not an adverse employment action, especially if the inconvenience is consistent with the plaintiff's job description." Ryan v. Town of Schererville, 2005 U.S. Dist. LEXIS 40542, at *61 (N.D. Ind. May 4, 2005) (citing Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004); see Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899, 903 n.1 (7th Cir. 2002) ("temporary change in job responsibilities" not an adverse employment action absent a significant diminishment of material responsibilities); Roberts v. Principi, 2006 U.S. Dist. LEXIS 40686, at *8 n.4 (E.D. Tenn. June 16, 2006) (citing Yates v. AVCO Corp., 819 F. 2d 630 (6th Cir. 1987)) ("As a general rule, a temporary transfer which results in no reduction in pay or benefits is not an 'adverse employment action.'"); cf. Bishop, 299 F.3d at 59 (mere fact that an employee is displeased by an employer's act does not elevate that act to a materially adverse employment action).

Even if Plaintiff could establish a prima facie case with respect to her temporary assignment to C&M training, Defendants have offered a legitimate, nondiscriminatory reason why Plaintiff and Alderman were assigned to C&M while Dawley and Langford were not. DeCamp, 875 A.2d at 22 ("[T]he burden of production now shifts to defendants to articulate a legitimate, nondiscriminatory reason for [adverse employment action.]"). It is undisputed that both Dawley and Langford already had the requisite C&M experience, and that Plaintiff and Alderman did not. Stmt. ¶ 51. As Plaintiff cannot show that this explanation is pretextual, or

point to any other facts that would support an inference of discrimination with respect to C&M training, her claim must fail.

c. Plaintiff Cannot Establish Prima Facie Case of Disparate Treatment with Respect to the Assignment of Survey Routes.

Plaintiff also complains that Richer treated her unfairly with respect to survey route assignments. She alleges that he did not assign her routes near her home, sent her on longer routes, e.g., to Westerly, and also sent her on routes through "bad" neighborhoods. Stmt. ¶ 52. Again, Plaintiff cannot establish the third required element of her prima facie case: that the route assignments, even if unfavorable, constituted an adverse employment action. Courts have found no adverse employment action where the plaintiff's transfer resulted in a much longer commute, Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998), where a bus driver was reassigned to a different route, Gilbert v. Indianapolis Pub. Schs., 2003 U.S. Dist. LEXIS 1193, at *23 (S.D. Ind. Jan. 5, 2003), or where the plaintiff's job became more stressful and difficult but there was no diminution in title, salary, or benefits. Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994); see also Bishop, 299 F.3d at 59.

Even if route assignments could be adverse employment actions, Plaintiff simply has no evidence to support her discrimination claims. There is no evidence that men were not sent to far away places like Westerly, nor is there any evidence that they were not sent to "bad" neighborhoods. Furthermore, Plaintiff's own admissions undermine any inference that Richer treated her unfavorably "because of" her gender. Cardona, 9 F. Supp. 2d at 99 (citing Oncale, 523 U.S. at 79). Plaintiff testified that when Barbara Alderman was not feeling well, Richer assigned Alderman routes near her home in East Providence. Plaintiff also testified that she received no such accommodation. Stmt. ¶ 52. Plaintiff's admission that Richer treated Alderman, a female, favorably with respect to route assignments is fatal to her otherwise "very

weak" disparate treatment claim. See Joens, 243 F. Supp. 2d at 949. There is no evidence that Richer assigned Plaintiff unfavorable routes as compared to her co-workers, or, if he did, that is was because of her sex. Therefore, Defendants are entitled to summary judgment on Plaintiff's disparate treatment claim regarding route assignments.

2. PLAINTIFF CANNOT ESTABLISH A HOSTILE WORK ENVIRONMENT BASED ON HER ALLEGATIONS WHILE IN LEAK SURVEY.

Plaintiff alleges that leak survey was a hostile environment, in which "[t]he boss [Cliff Richer] and Merle Dean had a special relationship and the bullying atmosphere was a back and forth – one would start it, one would add to it, and then back and forth." Stmt. ¶ 45. Specifically, Plaintiff's allegations of a hostile environment in leak survey consist of the following allegations against Richer:

- Richer called her the nicknames "One-Oar" and "Blondie." Stmt. ¶ 46.
- Richer commented that Plaintiff must have been involved in drinking and drugs because she was brought up in the '60s and '70s. Stmt. ¶ 49.

Plaintiff alleges that her co-worker, Merle Dean, contributed to the alleged hostile environment through the following alleged behaviors:

- Dean commented about the "tits on that one," referring to an actress in a movie he had seen with his wife the previous night.
- Dean talked with Richer about a story that had been circulated around the company regarding a man getting dragged around the shower by his penis.
- Dean would sing alternate lyrics, such as "Oh, I want to fuck my wife today," to "oldies" that were on the radio.
- Dean mentioned, while driving with Plaintiff, that a "black woman [had been] raped off the bridge."

Stmt. ¶ 50. Importantly, Plaintiff does not allege that Richer or Dean physically threatened or touched her or that either of them made sexual advances towards her. Plaintiff alleges that she was simply offended by what was said, and alleges that she felt "degrade[d]" by Richer's use of nicknames.

Simply put, Plaintiff has not alleged the existence of severe and pervasive harassment sufficient to materially alter the terms and conditions of employment that is required to state a viable hostile environment claim. Noviello 398 F.3d 76, 93 (quoting Faragher, 524 U.S.at 787-88). In determining whether a reasonable person would find particular conduct hostile or abusive, a court must examine the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

As discussed supra, employment antidiscrimination laws "do[] not guarantee a utopian workplace, or even a pleasant one," Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994), and are not a "general civility code." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see also Prader v. Leading Edge Products, Inc., 39 Mass. App. Ct. 616, 619 (1996) (a "culture of profanity," including calling plaintiff offensive names, did not constitute actionable harassment because the law does not mandate "clean language" in the workplace). "Stepping out of one's home into the working world means, to some extent, subjecting oneself to the slings and arrows of daily life. Title VII does not codify Emily Post's rules of etiquette." Feliciano v. Alpha Sector, Inc., 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002). As the Seventh Circuit has aptly stated, "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter tinged with sexual innuendo, of coarse or boorish workers would be

neither pervasive nor offensive enough to be actionable. The workplace that is actionable is one that is hellish." Perry v. Harris Chemin, Inc.,126 F.3d 1010, 1013 (7th Cir. 1997).

Given these parameters, Plaintiff's allegations, even if true, do not suffice to establish a work environment that a reasonable person would find objectively hostile. With regard to Richer's nicknames for Plaintiff, Richer only used the nickname "One-Oar" in a casual, joking manner.[8] Richer used the nickname "One-Oar" only after Plaintiff and Merle Dean returned to the department laughing after a breakfast during which the waitress had mistaken "Lynore" for "One-Oar." Richer did not know that Plaintiff was upset by the nickname "One-Oar" until he was alerted in June 2003 by his superior, Mike McGuire, that Plaintiff had lodged a complaint. Richer immediately apologized to Plaintiff, told her that he wished she had informed him that this bothered her, and stopped using the nickname. Significantly, Plaintiff does not allege that Richer continued to use the nickname after becoming aware that it upset her.

This is not a situation in which the alleged nicknames at issue were sexually charged, sexually explicit, or sexually demeaning. Cf. Lipsett v. University of Puerto Rico, 864 F.2d 881, 903 (1st Cir. 1988) (hostile environment existed because, inter alia, plaintiff's nickname was "Selastraga," which translated literally means, "she swallows them"). Plaintiff's alleged nicknames were far less sexually charged and offensive that that given the plaintiff in Lamothe v. New Hampshire Department of Corrections, where no hostile environment was found. See 2003 U.S. Dist. LEXIS 19050, at *16-18 (D.N.H. Oct. 24, 2003) (plaintiff's nickname was "Flashlight," which referred to the size of his penis).

As for Richer's remaining comment about Plaintiff's experience with drinking and drugs in the 1960s and '70s, and Dean's various allegedly offensive comments, these are precisely the

[8] Although Plaintiff alleges he also called her "Blondie," Richer denies ever doing so. Stmt. ¶ X.

type of "mere offensive utterance[s]" that constitute the "ordinary, if occasionally unpleasant, vicissitudes of the workplace." Noviello v. City of Boston, 398 F.3d at 93; Paquin, 233 F. Supp. 2d at 64 (although perhaps creating an unpleasant working environment, five instances of inappropriate conduct falls "well short of the frequency required to amount to an abusive working environment"). Furthermore, Plaintiff has presented no evidence to show that Richer's treatment of her, even if hostile, was based on her gender. Patton, 276 F.3d at 339. In fact, Plaintiff admitted that Richer did not have any nickname for Barbara Alderman, the only other female in the department. Stmt. ¶ 48. "The law does not prohibit all physical or verbal harassment in the workplace; rather, it prohibits harassment which is motivated by sex-based discrimination." Cardona, 9 F. Supp. 2d at 99.

At best, Plaintiff has alleged that Richer's alleged nicknames, and Richer's and Dean's alleged comments toward her were, like earlier complained-of actions, "purely personal." See Patton, 276 F.3d at 339. Incidents showing that a supervisor was rude or offensive toward an employee do not, without more, establish a claim of hostile work environment. Thomas v. New York City Health & Hosps. Corp., 2004 U.S. Dist. LEXIS 17694, at *51 (S.D.N.Y. Sept. 2, 2004). As long as the alleged offensive behavior was not based on a protected characteristic – and Plaintiff has no evidence that, in this case, it was – Rhode Island's antidiscrimination statutes are not implicated. See Patton, 276 F.3d at 339.

Finally, Plaintiff alleges that, in December 2004, co-worker Barbara Alderman called her name in the workplace and then showed her a gun. Plaintiff does not remember if Alderman said anything after calling her name. It is undisputed that Plaintiff left her workplace that day, and never returned. Even assuming that Alderman showed Plaintiff a gun, which Defendants vehemently deny, the surrounding circumstances are extremely ambiguous. There is no

ambiguity, however, with respect to the fact that there is no evidence that Alderman, a woman, showed Plaintiff a gun "because of [her] sex." Cardona, 9 F. Supp. 2d at 99. Moreover, in Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 747 (4th Cir. 1996), the court affirmed summary judgment on an employee's hostile environment claim based on his supervisor's conduct because there was no evidence that the conduct was based on plaintiff's sex. In Hopkins, the plaintiff alleged that his male supervisor, inter alia, pointed a gun at him.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's hostile environment claim while in leak survey from September 15, 2002 to the time Plaintiff left her employment in December 2004.

D. PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION FOR EMOTIONAL DISTRESS IS BARRED BY THE EXCLUSIVITY PROVISION OF THE WORKERS' COMPENSATION ACT, AND OTHERWISE FAILS FOR LACK OF PROOF.

Count III of the Amended Complaint asserts a claim for intentional infliction of emotional distress. That claim is barred by the exclusivity provision of the Rhode Island Workers' Compensation Act ("WCA"), R.I. Gen. Laws §28-29-20. Moreover, the claim fails for lack of proof of several elements necessary to establish the tort of intentional infliction of emotional distress.

Section 28-29-20 of the WCA provides that the right to compensation for a workplace injury is "in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise . . . ." A compensable workplace injury includes mental injury. R.I. Gen. Laws § 28-34-2(36). The Rhode Island Supreme Court has held that the WCA's exclusive remedy provision applied to bar a lawsuit in which the employee sought damages for, inter alia, work-related injuries caused by the employer's alleged intentional infliction of emotional distress. Cianci v. Nationwide Ins. Co., 659 A.2d 662, 667-70 (R.I. 1995). Relying on that decision, this

Court has held that "the WCA provides the exclusive remedy for claims against employers by employees who have suffered intentional infliction of emotional injury in the workplace." Iacampo v. Hasbro, 929 F. Supp. 562, 582 (D.R.I. 1996). Iacampo, like this case, involved allegations of sexual harassment. See id. at 569.

To defeat dismissal of Count III, Plaintiff must show either that she is not subject to the WCA, or that the emotional distress she suffered was unrelated to the workplace. Unless otherwise proven, an employee is presumed to be under the aegis of the WCA. Id. at 582. The Rhode Island Supreme Court has held repeatedly that "if an employee has not properly reserved his or her common-law rights under the act, he or she is barred from bringing a tort action against his or her employer if workers' compensation benefits are appropriate." Cianci, 659 A.2d at 668. Plaintiff has not alleged that she elected to preserve her common-law rights pursuant to R.I. Gen. Laws § 28-29-17; in the absence of any evidence, this Court must assume that Plaintiff is subject to § 28-29-20.

To be compensable under the WCA, an injury must "[arise] out of and in the course of" the plaintiff's employment, R.I. Gen. Laws § 28-33-1, a statutory requirement that the Rhode Island Supreme Court has refined into a "nexus" or "causal relationship" test. Martone v. State of Rhode Island/Registry of Motor Vehicles, 611 A.2d 384, 386 (R.I. 1992). The plaintiff must show that she was working for the employer at the time of injury, and that the injury occurred at a place where she might reasonably be and while she was engaged in duties or activities incidental thereto. Id. Plaintiff has alleged that the sexual harassment she suffered at the hands of Defendants took place at work. As these alleged actions underlie her claims of intentional infliction of emotional distress, she has established a causal relationship between her injuries and her employment.

Moreover, plaintiff's claim must fail for failure of proof on essential elements of the tort of intentional infliction of emotional distress. Rhode Island has adopted the standard for an intentional infliction of emotional distress claim set forth in section 46 of the Restatement (Second) of Torts. Swerdlick v. Koch, 721 A.2d 849, 862-63 (R.I. 1998) (citing Champlin v. Washington Trust Co. of Westerly, 478 A.2d 985, 988-89 (R.I. 1984)). To establish liability under this standard, Plaintiff must prove the following elements:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

Id. For the same reasons that plaintiff cannot establish the existence of a hostile work environment, she is unable to establish (1) that the conducts of defendants was in intentional or reckless disregard of the probability of causing emotional distress, or (2) that the conduct was extreme and outrageous. Moreover, Plaintiff cannot establish that defendants are vicariously liable the conduct alleged.

In addition, unlike many states that have adopted the Restatement, Rhode Island also requires that there be some medical proof establishing physical symptoms of distress. Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996) (citing Reilly v. United States, 547 A.2d 894, 899 n.3 (R.I. 1988) ("[T]he law in Rhode Island still requires physical symptomatology as an element of a claim when a defendant's intentional conduct has allegedly inflicted emotional distress. In so doing, we have applied a stricter standard of proof for this cause of action than that applied by the Restatement and many other states.")). The Court in Clift granted summary judgment to the defendants on a claim for intentional infliction of emotional distress due to the plaintiff's conclusory allegations of physical ills resulting from the

alleged emotional distress. Id. Plaintiff here has no proof of physical symptomatology sufficient to support a claim for intentional infliction of emotional distress. Therefore, Count III should be dismissed.

Finally, Plaintiff's claim is governed by the three year statute of limitations set forth in R.I. Gen. Laws § 9-1-14(b). Generally, a cause of action accrues and the applicable statute of limitations begins to run at the time of the injury. Plouffe v. Goodyear Tire and Rubber Co., 373 A.2d 492, 495 (R.I. 1977); Romano v. Westinghouse Electric Co., 336 A.2d 555, 559-60 (R.I. 1975). In some "narrowly circumscribed factual situations," Renaud v. Sigma-Aldrich Corp., 662 A.2d 711, 714-15 (R.I. 1995), however, when the fact of the injury is unknown to the plaintiff when it occurs, the applicable statute of limitations will be tolled and will not begin to run until, in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury causing wrongful conduct. Id. at 714-16 (holding that, in a product liability case, statute of limitations began to run at the time of injury). This is not a product liability case where the injury that Plaintiff alleges was somehow concealed from her. Therefore, in the event that the Court finds that Count III is not barred by the exclusivity provisions of the WCA, and that Plaintiff has satisfied the elements of her tort claim, she is limited to any alleged injuries that resulted from conduct that occurred after June 4, 2001.

## IV. Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment with respect to all Counts of the Amended Complaint, along with such other and further relief as the Court deems just and proper.

Respectfully submitted,
DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

Neal J. McNamara (#4249)
Matthew J. Frankel (#7293)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
mfrankel@nixonpeabody.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, via Federal Express overnight delivery and certified mail a true and accurate copy of the within document to Lynore Horn, 88 Alger Avenue, East Greenwich, RI 02821 this 30th day of June, 2006.