# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LYNORE HORN
Plaintiff

V 04- 434 S

SOUTHERN UNION GAS C OMPANY
NEW ENGLAND GAS COMPANY
Defendant

**PLAINTIFF"S MOTION FOR SACTIONS AND DEFAUIT**

Now comes the Plaintiff, Lynore Horn Pro Se who files this motion to default the Defendants "Southern Union Gas "for Sanctions or other relief. On the grounds that the Defendants purposely mislead the court and the plaintiff.

Respectfully Submitted
Plaintiff Pro Se
Lynore Horn

Dated March 10, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that the forgoing document was served on Nixon Peabody: Neal McNamara One Citizens Plaza Suite 500 Providence RI 02903, via regular mail

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LYNORE HORN
Plaintiff

V 04- 434 S

SOUTHERN UNION GAS C OMPANY
NEW ENGLAND GAS COMPANY
Defendant

**PLAINTIFF"S MEM ORANDUM IN SUPPORT OF MOTION FOR SANCTIONS AND DEFAUT**

Now comes the Plaintiff, Lynore Horn Pro Se who files this motion to default the Defendants "Southern Union Gas "for Sanctions or other relief. On the grounds that the Defendants purposely mislead the court and the plaintiff.

In an INTERROGATORY No 5 of case 04-434S He answered that guns in the garage could not be substantiated, during a deposition in case number 07-142S Another suit against Southern Union Gas. Don Brown during the deposition stated he told Bud Butler of Rifles in the Garage. A Rifle is a gun, just as a Machine gun or a hand gun. The lies of Henry Butler should be dealt with: The Company is falsifying paperwork and perjuring themselves : Attached Interrogatory 5 and Deposition Don Brown Pages 6-7-8-9-. I plead that this court recognizes this as perjury .

Respectfully Submitted
Plaintiff Pro Se

Lynore Horn

Dated March 10, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that the forgoing document was served on Nixon Peabody: Neal McNamara One Citizens Plaza Suite 500 Providence RI 02903, via regular mail

a woman in a bikini in the employees' gym at Dexter Street complained about its presence. The item was subsequently removed.

Supplemental Response: In addition, defendants believe that Leslie Wortman, formerly of Human Resources, has knowledge concerning magazines and calendars in the workplace. On information and belief, she now lives at 2320 E Mallory Street, Pensacola, Florida.

INTERROGATORY NO. 5 Did defendants (and/or any of their current or former agents, employees and/or representatives) ever hear, learn or suspect that plaintiff had complained about an incident involving a gun which took place while she was working? If the answer is yes, please:

(a) identify all person who have knowledge of this;
(b) for each person identified, set forth, in as much detail as possible, what he or she knows;
(c) for each person identified, set forth the date he or she first learned anything about this.
(d) if applicable, set forth what actions defendants took.

RESPONSE: During the early 1990s, Henry Butler heard a rumor from a source that he cannot recall that a gun had been present in the Dexter Street garage, and handled by an employee or employees in the garage during work time. Based on the company's prohibition against weapons in the workplace, Mr. Butler spoke to Bob Ringman, who questioned Fred Straight, the garage supervisor, about it. The rumor could not be substantiated. Plaintiff never complained to anyone in management about a gun being held to her head. In 2001, plaintiff mentioned to D'Anna Soehnge that an employee had on one previous occasion been playing around with a gun at work. Ms. Soehnge attempted to inquire about the incident, but the plaintiff declined to discuss it further, and did not provide any further details.

Supplemental Response: The rumor could not be substantiated because no one verified that a gun had been in the Dexter Street garage. The investigation did not include questioning of

C.A.NO. # 04-434S
Exhibit: 28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | C.A. No. 07-142-S |
| | : | |
| SOUTHERN UNION GAS CO., and | : | |
| NEW ENGLAND GAS COMPANY, | : | |
| Defendants. | : | |

DEPOSITION OF DON BROWN, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Melanie M. Chace, RPR, Notary Public in and for the State of Rhode Island at the offices of ALLIED COURT REPORTERS, 115 Phenix Avenue, Cranston, Rhode Island, on February 26, 2008, at 11:00 a.m.

PRESENT:

FOR THE PLAINTIFF..........LYNORE HORN, pro se

FOR THE DEFENDANTS.........NIXON PEABODY
BY: NEAL J. McNAMARA, Esq.

Page 6

supervisor?
A. I was responsible for the entire facilities, of the security of the building, the boilers, and responsible for the two people staffed, and facilities maintenance, who cleaned the facility, that was you and Tony, was one of them, Cesar Maccione was one at the time. And the overseer position was just to make sure that you were there performing your duties, and if you had any questions you were to come to me. But your direct reporter was Ed Buldoc, to my understanding.
Q. Do you ever remember the name Kenny Butterworth?
A. Yes.
Q. Did you ever feel that you were overseer of Kenny Butterworth?
A. Yes.
Q. Did you ever see or hear that Kenny Butterworth had a gun in his bag when he arrived to work?
A. No.
Q. Were you ever in fear of Kenny Butterworth?
MR. McNAMARA: Objection.
A. No.
Q. What did Ed Buldoc give you as an impression of me when I first came there, did he give you any impression?
A. I don't remember Ed Buldoc mentioning anything pertaining to you as -- other than you were coming to

Page 7

work there, you and somebody else, I believe from downtown, or you were filling a position. It's vague. I just don't remember. I know that you came to Dexter Street as the second floor facilities cleaner on that shift.
Q. When did the gun policy take place?
A. I don't remember.
Q. Do you remember why they put a gun policy in place?
A. No, I don't.
Q. Did you ever hear anything about why they put it in place?
A. I did not.
Q. In 1994, were you a supervisor of the garage, nights?
A. For a period of 1994, I believe I did the transition '94, '95, to the stockroom. I'm not sure which month I left.
Q. Did, at any time in 1994, 1995, did anyone come to you about an investigation of a gun being held to my head in the garage?
A. Not that I remember.
Q. Did Bud Butler, Fred Straight or Bob Ringman ever approach you about knowledge of a gun being held to my head?
A. Not that I remember.
Q. ~~Did they ask you if there were guns in the garage?~~

Page 8

A. Yes.
Q. When did they ask you?
A. I'm not sure of the year or date, but they asked, I believe it was Bud Butler asked if there were weapons in the garage. And at that time I mentioned to him that some of the gentlemen, the mechanics were avid hunters and gun collectors, and if they were out hunting during the course of the day, they did not have time to go home, they asked if they could bring their rifles into my office, unloaded, secured, because of problems with break-ins in private and company vehicles. I allowed that. At that time, there was no gun policy in place at the company. Not sure which year we're talking about, and they would take them out at the end of the night.
Q. Was Mike Rose one of the people that would ask you to do that, to put a gun into the room and keep it safe?
A. Yes. These were strictly rifles.
Q. Did you ever hear that Al Dionne -- is Al Dionne an employee of the gas company, first of all?
A. Yes.
Q. Did you ever hear that he had a gun license, a license to sell guns?
A. Yes.
Q. Did you ever hear that he was selling guns on the gas

Page 9

company property?
A. ~~I don't remember.~~
Q. You never heard or saw him sell a gun?
A. No.
Q. Do you know the name Mary Joe Hare?
A. Yes.
Q. Is she an employee of the gas company?
A. She was.
Q. Did you work with her?
A. Yes.
Q. Mary Joe Hare stated at one time that she had spoken with you, and you said you wouldn't be surprised if every customer service truck had a gun in it. So I'm asking you today, do you feel that is something that you said?
MR. McNAMARA: Objection.
A. No.
Q. You did not feel it, do you feel you spoke at all about guns with Mary Joe Hare?
A. No.
Q. Did you say anything that would even be close to that, about guns being in personal vehicles of people, with her?
MR. McNAMARA: Objection.
Q. To the best of your knowledge, did you ever speak with

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff, | : | |
| v. | : | C.A. No. 04-434-S |
| SOUTHERN UNION CO. & NEW ENGLAND GAS CO., Defendants. | : | |

**OBJECTION TO MOTION FOR SANCTIONS AND DEFAULT**

Defendants Southern Union Co. and New England Gas Co. ("Defendants") hereby object to Plaintiff Lynore Horn's motion for sanctions and default. Defendants rely upon the accompanying memorandum of law in support of their objection.

Respectfully submitted,

DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

/s/ Neal J. McNamara

Neal J. McNamara (#4249)
Jillian S. Folger-Hartwell (#6970)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
jfolgerhartwell@nixonpeabody.com

DATED: March 20, 2008

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, via regular mail and certified mail, return receipt requested, a true and accurate copy of the within document to Lynore Horn, 88 Alger Avenue, East Greenwich, RI 02818 this 20th day of March, 2008.

/s/ Neal J. McNamara

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LYNORE HORN,
Plaintiff,

v. : C.A. No. 04-434-S

SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.,
Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OBJECTION TO MOTION FOR SANCTIONS AND DEFAULT**

Defendants Southern Union Co. and New England Gas Co. ("Defendants") hereby object to Plaintiff Lynore Horn's ("Plaintiff") motion for sanctions and default and ask that this Court deny Plaintiff's motion.[1] Plaintiff's motion should be denied because it was filed beyond the date provided for filing such motions pursuant to this Court's November 29, 2004, Pretrial Order. In addition, Plaintiff's motion should be denied because Defendants' representative has not perjured himself, and because the evidence of such perjury that Plaintiff has presented does not provide support for her allegation.

Pursuant to this Court's Pretrial Order dated November 29, 2004, "[e]xcept as provided above with respect to motions in limine, after ten (10) days from the close of discovery, no motions hall be filed except by leave of Court." Discovery in this case closed on May 16, 2006.[2] Thus, Plaintiff should have filed this motion on or before May 26, 2006. Instead, Plaintiff has waited almost two years to file this motion. For that reason alone, Plaintiff's motion should be denied.

---

[1] Plaintiff presumably brings her Motion for Sanctions under Rule 37(c) of the Federal Rules of Civil Procedure, although she does not reference any rule in either her motion or memorandum.

[2] Pursuant to this Court's Order dated March 17, 2006, the discovery deadline in this matter was extended to May 16, 2006. Thereafter, on May 19, 2006 this Court extended the discovery deadline to May 30, 2006, but only for the limited purpose of Dr. Holly Tytell's deposition.

Moreover, Plaintiff claims that Defendants' representative has perjured himself and that the Court should penalize Defendants by issuing a default judgment against them. Perjury requires a finding that "[a] witness testifying under oath or affirmation . . . [gave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. D'Andrea, 107 F.3d 949, 958 (1st Cir. 1997) (quoting Dunnigan, 507 U.S. at 94.); see Wiggins v. Rhode Island, 326 F. Supp. 2d 297, 305 (D.R.I. 2004) (perjury defined by R.I. Gen. Laws § 11-33-1(a) as requiring knowingly false material declaration). Inherent in a finding of perjury is proof that the testimony given is false.

Here, Plaintiff provides no such proof; rather, the responses to Interrogatory No. 5 and Mr. Brown's deposition testimony support the same version of events. Specifically, Interrogatory No. 5 asked:

> INTERROGATORY NO. 5 Did defendants (and/or any of their current or former agents, employees and/or representatives) ever hear, learn or suspect that plaintiff had complained about an incident involving a gun which took place while she was working? If the answer is yes, please:
> (a) identify all person who have knowledge of this;
> (b) for each person identified, set forth, in as much detail as possible, what he or she knows;
> (c) for each person identified, set forth the date he or she firms learned anything about this. (SIC)
> (d) if applicable, set forth what actions defendants took.

Defendants' Supplemental Answers to Plaintiff's First Set of Interrogatories, Response & Supplemental Response No. 5, relevant portions of which are attached hereto as Ex. A. Defendants responded as follows:

> **RESPONSE**: During the early 1990s, Henry Butler heard a rumor from a source that he cannot recall that a gun had been present in the Dexter Street garage, and handled by an employee or employees in the garage during work time. Based on the company's prohibition against weapons in the workplace, Mr. Butler spoke to Bob Ringman, who questioned Fred Straight, the garage supervisor, about it. The

> rumor could not be substantiated. Plaintiff never complained to anyone in management about a gun being held to her head. In 2001, plaintiff mentioned to D'Anna Soehnge that an employee had on one previous occasion been playing around with a gun at work. Ms. Soehnge attempted to inquire about the incident, but the plaintiff declined to discuss it further, and did not provide any further details.
>
> Supplemental Response: The rumor could not be substantiated because no one verified that a gun had been in the Dexter Street garage. The investigation did not include questioning of plaintiff because the company was not aware that she had any information. She did not work in the garage, therefore the company did not question her. She never complained of any incident regarding a gun, although defendants have learned subsequently that plaintiff purchased a gun from Mike Rose, an employee in the garage.

Id. (emphasis added).

The allegedly conflicting deposition testimony that Plaintiff attached to her motion for sanctions relates to an entirely different question than that asked in Interrogatory No. 5. During his deposition, Plaintiff asked Mr. Brown if a supervisor ever questioned him about "guns in the garage." See Deposition of Don Brown at 7: 25; 8:1-18, relevant portions of which are attached hereto as Ex. B. Mr. Brown answered in the affirmative and described, although he could not identify the year or date, that some of his employees had asked if they could secure their hunting rifles in his office rather than in their vehicles while they were at work, because there had been some instances of items being stolen from vehicles in the employer's parking lot. See id. at 8:3-15. When asked specifically if he had any knowledge of an incident in which a gun was held to Plaintiff's head, Mr. Brown answered "[n]ot that I remember." Id. at 7:17-20. When asked again if specific employees told Mr. Brown about such an incident the witness replied again "[n]ot that I remember." Id. at 7:21-24.

There is no conflict between the answer to Interrogatory No. 5, in which Defendants state that Plaintiff did not complain about an incident relating to a gun, and Mr. Brown's testimony about permitting his employees to secure their hunting rifles in his office during working hours.

In fact, when Mr. Brown was asked about an incident in which a gun was held to Plaintiff's head – the same question set forth in Interrogatory No. 5 – he answered that he could recall no such incident, thus confirming the information provided in Defendants' responses to Interrogatory No. 5.[3] Plaintiff has presented no evidence, whatsoever, that Defendants and/or their employees provided any false testimony during the discovery process.

For the foregoing reasons, Defendants ask that Plaintiff's Motion for Sanctions and Default be denied.

Respectfully submitted,

DEFENDANTS SOUTHERN UNION CO. &
NEW ENGLAND GAS CO.

By their attorneys,

NIXON PEABODY LLP

/s/ Neal J. McNamara
Neal J. McNamara (#4249)
Jillian S. Folger-Hartwell (#6970)
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030
nmcnamara@nixonpeabody.com
jfolgerhartwell@nixonpeabody.com

DATED: March 20, 2008

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I sent, via regular mail and certified mail, return receipt requested, a true and accurate copy of the within document to Lynore Horn, 88 Alger Avenue, East Greenwich, RI 02818 this 20th day of March, 2008.

/s/ Neal J. McNamara

[3] In addition, even if the testimony did conflict – which it does not – evidence that one witness would have a different recollection than another witness about the same events is not evidence of perjury.

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LYNORE I. HORN,<br>Plaintiff,<br>v.<br>SOUTHERN UNION COMPANY, et al,<br>Defendants. | C.A. NO. 04-434-S |

**DEFENDANTS' SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

INTERROGATORY NO. 3 During the period 1989 to the present time, did defendant (or any of its current or former agents, employees and/or representatives) ever hear, see, suspect and/or learn the there were magazines, pictures and/or posters depicting naked or partially clad females anywhere in the work place? If the answer is yes, please:

(a) Identify (by name, current or former business and home address, telephone number, and position) all persons who heard, suspected, saw or learned this;
(b) for each person identified, set forth what he or she heard, suspected, saw or learned;
(c) if applicable, for each person identified, state what action he or she took, if any.

OBJECTION AND RESPONSE: Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and is not calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Henry Butler is aware that calendars and magazines containing pictures of women were occasionally present in the workplace. Whenever such items came to Mr. Butler's attention, he would instruct that they be removed. In approximately 1997, an employee whose daughter had reportedly seen a picture of

a woman in a bikini in the employees' gym at Dexter Street complained about its presence. The item was subsequently removed.

Supplemental Response: In addition, defendants believe that Leslie Wortman, formerly of Human Resources, has knowledge concerning magazines and calendars in the workplace. On information and belief, she now lives at 2320 E Mallory Street, Pensacola, Florida.

INTERROGATORY NO. 5 Did defendants (and/or any of their current or former agents, employees and/or representatives) ever hear, learn or suspect that plaintiff had complained about an incident involving a gun which took place while she was working? If the answer is yes, please:

(a) identify all person who have knowledge of this;
(b) for each person identified, set forth, in as much detail as possible, what he or she knows;
(c) for each person identified, set forth the date he or she first learned anything about this.
(d) if applicable, set forth what actions defendants took.

**RESPONSE:** During the early 1990s, Henry Butler heard a rumor from a source that he cannot recall that a gun had been present in the Dexter Street garage, and handled by an employee or employees in the garage during work time. Based on the company's prohibition against weapons in the workplace, Mr. Butler spoke to Bob Ringman, who questioned Fred Straight, the garage supervisor, about it. The rumor could not be substantiated. Plaintiff never complained to anyone in management about a gun being held to her head. In 2001, plaintiff mentioned to D'Anna Soehnge that an employee had on one previous occasion been playing around with a gun at work. Ms. Soehnge attempted to inquire about the incident, but the plaintiff declined to discuss it further, and did not provide any further details.

Supplemental Response: The rumor could not be substantiated because no one verified that a gun had been in the Dexter Street garage. The investigation did not include questioning of

plaintiff because the company was not aware that she had any information. She did not work in the garage, therefore the company did not question her. She never complained of any incident regarding a gun, although defendants have learned subsequently that plaintiff purchased a gun from Mike Rose, an employee in the garage.

<u>INTERROGATORY NO. 12</u>. For the period five years before plaintiff began working for defendant and up until the present time, has any current or former employee (including plaintiff) or any applicant for employment ever alleged, insinuated, suggested, implied, stated, grieved or complained, whether or not in a lawsuit or charge of discrimination, that he or she was harassed, discriminated against, disciplined, penalized, treated unfairly, differently, or adversely based upon his or her sex? If the answer is yes, please set forth each instance in which this has happened. Your answer should include, but not limited to, the identity of all persons involved including any supervisors, managers and/or officers who have knowledge of each claim, allegation, insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the identity of the person or persons making or initiating any such claims, allegations, insinuations, suggestion, implications, statements, complaints, charges and/or lawsuits, the date, substance, status, and/or disposition of each allegation, claim insinuation, suggestion, implication, statement, complaint, charge and/or lawsuit, the names of all complainants, respondents, plaintiffs and defendants, and where any such complaints were made, filed or are pending.

<u>OBJECTION</u>: Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad and is not calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objections, Carol Petrarca, Christine Stamp, Roberta Faria and Wendy Smith have made claims regarding sex discrimination/harassment. <u>Supplemental Response</u>: Defendants have not withheld names based on any objections, but have identified additional individuals. Brenda Shanley, an employee in Information Technology, sued for sex discrimination in or about 2000. Her attorney was Patricia Andrews, counsel for plaintiff here. That matter was the subject of litigation and was settled. In 2004, Stephen Ferrante filed an action against defendants in Providence County Superior Court alleging sex discrimination, i.e., that he was terminated while women were being promoted, and violation of the Rhode Island Parental and Medical Leave Act. That action was settled in May 2005.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LYNORE HORN, Plaintiff, | : | |
| vs. | : | C.A. No. 07-142-S |
| SOUTHERN UNION GAS CO., and NEW ENGLAND GAS COMPANY, Defendants. | : | |

DEPOSITION OF DON BROWN, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Melanie M. Chace, RPR, Notary Public in and for the State of Rhode Island at the offices of ALLIED COURT REPORTERS, 115 Phenix Avenue, Cranston, Rhode Island, on February 26, 2008, at 11:00 a.m.

PRESENT:

FOR THE PLAINTIFF..........LYNORE HORN, pro se

FOR THE DEFENDANTS.........NIXON PEABODY
BY: NEAL J. McNAMARA, Esq.

supervisor?
A. I was responsible for the entire facilities, of the security of the building, the boilers, and responsible for the two people staffed, and facilities maintenance, who cleaned the facility, that was you and Tony, was one of them, Cesar Maccione was one at the time. And the overseer position was just to make sure that you were there performing your duties, and if you had any questions you were to come to me. But your direct reporter was Ed Buldoc, to my understanding.
Q. Do you ever remember the name Kenny Butterworth?
A. Yes.
Q. Did you ever feel that you were overseer of Kenny Butterworth?
A. Yes.
Q. Did you ever see or hear that Kenny Butterworth had a gun in his bag when he arrived to work?
A. No.
Q. Were you ever in fear of Kenny Butterworth?
MR. McNAMARA: Objection.
A. No.
Q. What did Ed Buldoc give you as an impression of me when I first came there, did he give you any impression?
A. I don't remember Ed Buldoc mentioning anything pertaining to you as -- other than you were coming to



work there, you and somebody else, I believe from downtown, or you were filling a position. It's vague. I just don't remember. I know that you came to Dexter Street as the second floor facilities cleaner on that shift.
Q. When did the gun policy take place?
A. I don't remember.
Q. Do you remember why they put a gun policy in place?
A. No, I don't.
Q. Did you ever hear anything about why they put it in place?
A. I did not.
Q. In 1994, were you a supervisor of the garage, nights?
A. For a period of 1994, I believe I did the transition '94, '95, to the stockroom. I'm not sure which month I left.
Q. Did, at any time in 1994, 1995, did anyone come to you about an investigation of a gun being held to my head in the garage?
A. Not that I remember.
Q. Did Bud Butler, Fred Straight or Bob Ringman ever approach you about knowledge of a gun being held to my head?
A. Not that I remember.
Q. Did they ask you if there were guns in the garage?



A. Yes.
Q. When did they ask you?
A. I'm not sure of the year or date, but they asked, I believe it was Bud Butler asked if there were weapons in the garage. And at that time I mentioned to him that some of the gentlemen, the mechanics were avid hunters and gun collectors, and if they were out hunting during the course of the day, they did not have time to go home, they asked if they could bring their rifles into my office, unloaded, secured, because of problems with break-ins in private and company vehicles. I allowed that. At that time, there was no gun policy in place at the company. Not sure which year we're talking about, and they would take them out at the end of the night.
Q. Was Mike Rose one of the people that would ask you to do that, to put a gun into the room and keep it safe?
A. Yes. These were strictly rifles.
Q. Did you ever hear that Al Dionne -- is Al Dionne an employee of the gas company, first of all?
A. Yes.
Q. Did you ever hear that he had a gun license, a license to sell guns?
A. Yes.
Q. Did you ever hear that he was selling guns on the gas



company property?
A. I don't remember.
Q. You never heard or saw him sell a gun?
A. No.
Q. Do you know the name Mary Joe Hare?
A. Yes.
Q. Is she an employee of the gas company?
A. She was.
Q. Did you work with her?
A. Yes.
Q. Mary Joe Hare stated at one time that she had spoken with you, and you said you wouldn't be surprised if every customer service truck had a gun in it. So I'm asking you today, do you feel that is something that you said?
MR. McNAMARA: Objection.
A. No.
Q. You did not feel it, do you feel you spoke at all about guns with Mary Joe Hare?
A. No.
Q. Did you say anything that would even be close to that, about guns being in personal vehicles of people, with her?
MR. McNAMARA: Objection.
Q. To the best of your knowledge, did you ever speak with